THE STATE OF OHIO, APPELLEE, *v.* BROWN, APPELLANT.

[Cite as *State v. Brown,* 115 Ohio St.3d 55, 2007-Ohio-4837.]

(No. 2005–0749—Submitted January 24, 2007—Decided October 3, 2007.)

_____

LANZINGER, J.

{¶ 1} This is an appeal as of right filed by Vernon Brown, who was convicted and sentenced to death for the aggravated murder with prior calculation and design of Duane Roan. Brown was also convicted of the murder of Tearle Toeran, aggravated robbery with firearm specifications, and two weapons violations.

{¶ 2} Among 21 assignments of error, Brown argues that trial counsel was ineffective by failing to challenge the competency to testify of his alleged wife, Jillian Wright, who was the main witness against him. He also argues that the state violated *Brady v. Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d

215, by failing to disclose evidence favorable to him. We agree that for these two reasons, we must vacate the conviction and remand for a new trial.

## Testimony at Trial

{¶ 3} The state's theory during jury trial was that on the evening of January 1, 2004, Brown, a.k.a. "Broadway," met with Duane Roan and Tearle Toeran on a west-side Cleveland street to buy drugs. During the transaction, Brown pulled a gun, shot and killed both men, and then fled the scene in the victims' car. In support of its case, the state presented the testimony of 26 witnesses over ten days of trial.

{¶ 4} The defendant did not call witnesses during the guilt phase, nor did he present any evidence following the close of the state's case. The defense's theory of the case acknowledged that Brown was involved in the deaths of Toeran and Roan, but contested whether he had acted with the level of intent required to support the charges of aggravated murder with prior calculation and design. Although the defense did introduce five exhibits, they were all presented during cross-examination of the state's witnesses, and most were related to the status of the relationship between Brown and Jillian Wright.

## Jillian Wright's Testimony

{¶ 5} Wright, who was a key witness for the prosecution, testified that Brown often stayed with her at her apartment on West 54th Street in Cleveland during December 2003 and January 2004.[1] She said that on January 1, 2004, Brown had her drive him to an apartment on West 52nd Street, where a man she identified as "Jay" or "Capone," later identified as James Donley, lived and sold drugs.[2] Wright testified that she took Brown's Cadillac Escalade and dropped him off at Donley's around 8:30 p.m. She said that sometime after 9:00 p.m., she received a call from Brown requesting that she return and give him a ride home.

{¶ 6} When she arrived to pick up Brown, Wright testified, he told her that his plans had not gone through. Wright said that while she and Brown were talking, two men whom she did not know but later identified at trial as Roan and Toeran, arrived at Donley's apartment in a Mitsubishi sedan. According to Wright, Brown got into the back seat of that car, and after two or three minutes, returned to the Escalade and told her to go home. She said Brown then returned to the back seat of the Mitsubishi.

---

1. Wright testified that she and Brown were not married but acknowledged that they had obtained a marriage license. As discussed in Proposition II, Brown contends that Wright should not have been allowed to testify against him because they were married on December 29, 2003.

2. Donley was also identified as "Bishop," Jamill Williams, Shawan Cook, Todd Mosley, Jason Young, or Jason Morrow.

{¶ 7} Rather than going home as Brown had instructed, Wright drove around the block and returned to the street in front of Donley's apartment. She parked behind the Mitsubishi, which had not moved, and followed as the car moved slowly down the street.

{¶ 8} Wright said that after moving slightly down West 52nd Street, the driver pulled his car over to the curb. Two men left the car with their hands in the air. Brown pointed a gun at both of the men as he followed them out of the car and motioned them toward the sidewalk. According to Wright, the three men were talking, and the talking got louder and louder. Wright testified that when the passenger "reached for something in his back pocket," Brown shot him in the back of the head. Wright said that the other man started running toward a vacant lot, and Brown chased him and shot him three times. That man fell to the ground and turned over on his back. Wright testified that Brown then walked over to him and shot him in the face.

{¶ 9} Wright testified that after the shooting, Brown drove away in the Mitsubishi. She also left the area but did not follow Brown. Shortly thereafter, Brown called her on her cell phone and asked her to meet him at his mother's rental property on Superior Avenue in East Cleveland. Brown parked the Mitsubishi in the garage at the rental property, got into the Escalade, and drove to Wright's apartment on West 54th Street.

{¶ 10} Wright and Brown returned to Donley's apartment later that evening, and while she remained there, Brown left the apartment for about five minutes. When the two were leaving Donley's apartment, Wright asked Brown where he had gone. She testified that Brown told her that he "went to go make sure the boys were dead." Wright said they returned to her apartment. She testified that sometime over the course of the evening, she and Brown discussed the murders. She told Brown, "[T]o kill somebody is one of the Ten Commandments. * * * [Y]ou will go to hell for that." He responded by showing her a Biblical passage that says, "[W]hatever sin you commit, it can be forgiven if you ask for forgiveness."

### James Donley's Testimony

{¶ 11} One of the state's other key witnesses was Donley, who also testified about events that took place on the night of the murders, as well as statements that Brown later made to him. Much of Donley's testimony at trial conflicted with previous statements he had made to the police regarding the case.

{¶ 12} Donley testified that Brown and Roan met at his house in the morning of January 1 to discuss a drug transaction. Donley said that he thought Roan did not have any drugs with him at the time, so the deal was postponed until later.

{¶ 13} Sometime after 9:00 p.m., Donley left his house with his girlfriend, Emily Stewart, and an occasional roommate, Leon Jackson, to buy food at Top's Supermarket. He said that when he left, Brown was outside. Donley thought that Brown was preparing to leave and get into the Escalade driven by Wright. Donley said that before he left, he told Brown to "be careful." When they returned from the grocery store, Donley saw fire trucks and a couple of police cars about half a block from his house. He said he was unable to see what was going on because the fire engines were blocking his view. He also testified that neither he nor anyone he was with approached the scene to find out what was going on.

{¶ 14} Donley testified that Brown came to his house later that evening, after 11 p.m., and told Donley that he "got them. He * * * got Maggot." Donley testified that at that point, he did not know that Roan had been killed, and so he warned Brown that Roan "is not really the type of guy that you can play with." According to Donley, Brown responded to this warning by saying, "[S]crew them. * * * [T]hey ain't going to do nothing."

{¶ 15} Donley testified that he did not find out about Brown's role in the murders until one or two days later. On January 3, while Brown was giving Donley, Donley's daughter Capri, and Leon Jackson a ride in the Escalade, they passed a memorial to Roan and Toeran. According to Donley, Brown said "bye" and waved at the memorial.

{¶ 16} Brown then pulled out his pistol, which he called "Mike Tyson." According to Donley's account, Brown imitated the voice of the boxer, Mike Tyson, and talked "like he was asking the gun questions." Donley said Brown described how he had shot the two victims. He claimed that Brown said that after he shot Toeran, "the fat boy ran, so I jabbed him. Knew he was scared. * * * And I jabbed him and I jabbed him again. And then I turned him over and I knocked him the f—— out." According to Donley, Brown said that Roan was pleading for his life before he shot him and that he "[s]hot him in the chest, shot him in the stomach, shot him in the face. He died with his eyes open, hands up * * * trying to shield [himself] from the gunshots."

### Testimony of Other Witnesses

{¶ 17} Leon Jackson, who was riding in the Escalade with Donley and Brown when they passed the memorial to Roan and Toeran, also testified at trial. His account of the conversation that occurred in the car conflicts with Donley's. According to Jackson's testimony, when the car passed the memorial to Toeran and Roan, Brown said "F—— the mother f——s," but did not say anything further regarding the shootings at the time.

{¶ 18} Jackson testified that later, while at Donley's house, Brown discussed the murders with him. He recounted a conversation with Brown in which Brown told him, "I Tysoned them n——s," which Jackson said he understood to mean that Brown had shot Roan and Toeran. Jackson said Brown described how he had shot one man in the back of the head and had shot the other while standing over him.

{¶ 19} Jackson also testified that he had accompanied Donley and Stewart to the supermarket on the night of the murders. He said that when they returned from the store and the police cars were parked down the street, he went to investigate and found out that a shooting had occurred. Jackson remained at Donley's house and was there when Brown returned twice that evening, first alone and a second time with Wright. Contrary to Donley's testimony that he was unaware until several days later that Toeran and Roan had been killed, Jackson testified that after Brown left the first time, Donley told Jackson that the two men were dead.

### Testimony of Investigators

{¶ 20} The state presented testimony from several police officers involved in the investigation of the two murders. These officers testified about the physical evidence in the case as well as the circumstances that led to Brown's arrest.

{¶ 21} Officer Harry Matlock was the lead homicide detective on the case. He testified that when he was called to the crime scene on the evening of the murders, he saw Toeran's body lying partially on the sidewalk. An empty shell casing was recovered approximately one foot from Toeran's head. Matlock said there were no weapons in Toeran's hands, and no drugs were found on his body. Police did find a loaded Smith & Wesson 9 mm handgun in Toeran's coat pocket. When Toeran's body was examined at the coroner's office, $7,094 was discovered in his sock.

{¶ 22} Photos of the crime scene depict Roan's body in a vacant lot approximately 35 feet from the street. Matlock indicated that when Roan's body was found, he was lying on his back. Three shell casings were found near his body. According to Matlock, there were no weapons in Roan's hands, and no drugs were found on him, but police found a loaded 9 mm handgun in the waistband of his pants and $440 on him.

{¶ 23} Dr. Joseph Felo, deputy coroner for Cuyahoga County, performed autopsies on the two victims. Toeran suffered a single gunshot wound to the back of his head behind the right ear. Dr. Felo testified that he had found fouling, or gun smoke, and stippling, or unburned gunpowder, around the entrance wound. He determined that the muzzle-to-target distance was less than six inches. Dr. Felo concluded that Toeran died of the gunshot wound.

{¶ 24} Roan suffered four gunshot wounds. Roan was shot in his right jawbone, his right collarbone, on the right side of his chest, and in his left buttock. Dr. Felo said he was unable to determine the sequence of the shots. He indicated that because he had found stippling over the right eyelid and cheekbone, he determined that the muzzle-to-target distance of the gunshot wound to the face was ten to 14 inches. Dr. Felo concluded that the path of the bullet "traveled from Roan's [right] side towards his left, from the front of him toward his back, and upward." He testified that these findings were consistent with Roan's being shot in the face while lying on his back. Dr. Felo concluded that Roan died from the "combination of four gunshot wounds to his head, trunk and lower extremity, with multiple skeletal and vascular injuries."

{¶ 25} Curtiss Jones, a forensic scientist with the Cuyahoga County Coroner's Office, examined Roan's clothing for trace evidence. Jones testified that the front shoulder area of Roan's jersey was the entrance location of one of the gunshots. Based on a chemical test known as the Griess test, Jones found "numerous nitrates" around the entrance site and determined that the muzzle-to-target distance was one to two feet. Next, Jones found a gunshot entrance location on the right back area of the jersey. Jones testified that "[a] few nitrates were noted, indicating an approximate muzzle to target distance of three to four feet." Finally, Jones detected a gunshot entrance location on the lower back area of the jersey. "On the Griess test that was performed, there were no nitrates detected * * *, indicating an approximate muzzle to target distance of four feet or greater."

{¶ 26} Detective Matlock testified that aside from the physical evidence immediately available at the scene and that derived from the autopsies, the investigation of the murders did not get off to a quick start. There were no immediate suspects, and the only lead the police initially had was to look for a dark-colored Ford Explorer and a silver foreign car. Matlock stated that a significant break in the case came on January 4, when Detective Robert Beveridge came to the homicide unit to report that he had received a tip from an informant. According to Matlock, the entire case against Brown developed through this tip.

{¶ 27} Beveridge prepared a report detailing the information he had received from the tip. Matlock said that the report informed police that they should be looking for a black Cadillac Escalade that was usually parked on 54th Street. Matlock also stated that the tip identified by nickname two men who may have been involved in the murders. The two names the informant identified were "Broadway" and "Capone."

Testimony About Brown's Arrest and Search

{¶ 28} The information contained in the tip led eventually to Brown's arrest. Detective Joseph Bovenzi participated in the arrest and testified at trial about the

circumstances surrounding it. Bovenzi stated that police were on the lookout for a black sports utility vehicle ("SUV") with fictitious plates, and that on January 6 they received a report from a zone car that a vehicle matching that description was parked on the corner of West 54th and Detroit Streets. Although the vehicle sighted was a Cadillac Escalade, the plates were registered to a Ford. Bovenzi testified that police placed the vehicle under surveillance and waited to see whether anyone would approach or drive away in it. While the vehicle was under surveillance, Brown left an apartment building, entered the Escalade, and drove away. Bovenzi said that officers followed the vehicle and stopped it on West 52nd Street. Brown was arrested, and during the pat-down, a loaded .45–caliber semiautomatic handgun, an extra magazine, and a Mitsubishi key and keyless remote were found in Brown's pockets. After Brown was taken to the police station, the police took his clothes, including his blue suede boots.

{¶ 29} Detective Michael Rinkus also participated in Brown's arrest and testified about the police investigation that followed it. Rinkus stated that the police talked with the manager of the apartment building and gave her Brown's name and description. Rinkus testified that the manager directed them to apartment 301, where Brown stayed with Wright. The police went to Wright's apartment and received her consent to search the apartment.

{¶ 30} Rinkus testified that after Wright signed a consent-to-search form, the police conducted a thorough search of the apartment. The police seized a Mitsubishi owner's manual and vehicle registration. Rinkus also indicated that the officers later verified that the vehicle registration belonged to the Mitsubishi. Rinkus testified that two different brands (Federal and Blazer) of .45–caliber ammunition, a black plastic gun case, and a magazine loader were seized.

{¶ 31} Carey Martin, a DNA analyst with the Cuyahoga County Coroner's Office, testified that she conducted DNA testing of a swab from a stain on the sole of one of Brown's boots. Testing showed that the DNA profile obtained from the stain was a mixture. According to Martin, Roan could not be excluded from this mixture, but Tearle Toeran could be excluded.

{¶ 32} Ebonyse Osborne, Brown's sister, testified that she purchased a .45–caliber Taurus handgun and ammunition on November 4, 2003, at a Cleveland area gun store. Brown accompanied her when she bought the gun. After buying it, she took the gun to her apartment and placed it in a drawer. She indicated that the .45–caliber handgun that the police seized from Brown on the night of his arrest was the handgun that she had purchased.

{¶ 33} Osborne also said she had owned a Ford Taurus, but she had removed the license plates and put them in her living room after she sold the car. She identified the number on her old license plates as the number on the license plates that were on Brown's Escalade at the time of his arrest.

{¶ 34} Detective Nathan Willson, a firearms examiner, inspected the Taurus .45–caliber semiautomatic handgun that was seized from Brown when he was arrested. He said a trigger-pull test determined that the handgun did not have a "hair trigger" because it "took between 6.75 and 7 pounds to trip the firing mechanism." Willson testified that he compared samples he obtained from test-firing the gun with the bullets removed from Toeran and Roan and concluded that the "four spent bullets that were recovered from the morgue were fired from * * * the Taurus PT 145 semiautomatic pistol." Willson also said he determined that the four spent shell casings recovered from the murder scene "were fired from * * * the Taurus PT 145 semiautomatic pistol."

## Indictment and Verdicts

{¶ 35} Count 1 of the indictment against Brown charged him with the aggravated murder of Tearle Toeran with prior calculation and design. Count 2 charged Brown with the aggravated murder of Duane Roan with prior calculation and design.

{¶ 36} Both counts included death-penalty specifications for a course of conduct in purposely killing Toeran and Roan, in violation of R.C. 2929.04(A)(5), and murder while committing, attempting to commit, or fleeing after committing aggravated robbery, in violation of R.C. 2929.04(A)(7). Each count contained two firearm specifications. Each count also contained a repeat-violent-offender specification that was later dismissed. Brown was charged with three additional counts: Count 3 charged Brown with aggravated robbery and included two firearm specifications, Count 4 charged him with carrying a concealed weapon, and Count 5 charged him with carrying a concealed weapon while under a disability.

{¶ 37} Brown pleaded not guilty to the charges. After trial, the jury found Brown guilty of the lesser included offense of murder in Count 1 and guilty as charged in Counts 2, 3, and 4. The trial court found Brown guilty of Count 5 after he had waived a jury trial on this offense. Following a penalty-phase hearing, Brown was sentenced to death for his conviction on Count 2.

## Legal Analysis

{¶ 38} The evidence shows that Brown was involved in the deaths of Toeran and Roan and was present at the time they were killed. Under the circumstances of this case, the jury was required to conclude not only that Brown was responsible for the deaths of Toeran and Roan, but also that he acted with prior calculation and design. We are not convinced, however, that Brown's guilty verdicts and death sentence are worthy of confidence, for the errors by both the prosecution and defense cause us to question whether the jury's conclusions could have been fairly reached. The prosecution breached its duty to provide to the

defense all evidence material to Brown's guilt or innocence. The defense attorneys also erred by failing to provide effective assistance of counsel.

### *Brady* Violation

{¶ 39} Due process requires that the prosecution provide defendants with any evidence that is favorable to them whenever that evidence is material either to their guilt or punishment. *Brady,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Evidence is considered material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481. This standard of materiality does not require that disclosure of the evidence would have resulted in the defendant's acquittal. *United States v. Agurs* (1976), 427 U.S. 97, 111, 96 S.Ct. 2392, 49 L.Ed.2d 342.

{¶ 40} In determining materiality, the relevant question "is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley* (1995), 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490. Thus, the rule set forth in *Brady* is violated when the evidence that was not disclosed "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Id. at 435, 115 S.Ct. 1555, 131 L.Ed.2d 490. In the end, this standard not only protects defendants; by ensuring a fair trial, it also protects the system of justice as a whole.

{¶ 41} In this case, Brown contends that he was denied a fair trial and due process because the prosecutor failed to turn over police reports containing statements implicating Donley and others in the murders of Roan and Toeran. Brown's attorneys were diligent in requesting disclosure of any evidence that might be material to Brown's guilt or punishment. They first requested this evidence in February 2004 in a motion for discovery, which also sought to examine exculpatory and mitigatory material. The state filed a response to the motion for discovery acknowledging its responsibilities under *Brady* and promising to fulfill them.

{¶ 42} Later, at a pretrial hearing, the defense argued the motion for disclosure of exculpatory evidence, particularly law enforcement documents, and requested that the prosecutor's file be sealed and made a part of the record for appellate review.

{¶ 43} Brown now points to three documents uncovered in the prosecutor's file to support his *Brady* claim. One is a letter about the plea bargain and sentencing of Emily Stewart, a minor witness, on drug charges. Because the defense knew of her plea bargain and even questioned her about it on cross-

examination, the letter does not constitute a violation of *Brady*. The other two documents, however, are police reports, both indicating that someone other than Brown had claimed responsibility for the murders of Toeran and Roan. These undisclosed police reports ultimately put the reliability of the verdict in question.

{¶ 44} One of the reports documents a police interview with a man named Dudley Gang. In the interview, Gang told the police that during a drug purchase from Donley, known to him as "Bishop," Donley stated that he had been responsible for the shooting of Toeran and Roan. Gang said that Donley had claimed that he, a man named Joe who was also known as 101, and another man shot the two men on New Year's Day, and that both men had guns and were from Maple Heights. Gang selected Donley from a photo lineup, identifying him as the man that he knew as Bishop.

{¶ 45} The second undisclosed police report contains an interview with Toeran's father, Willie Toeran. In that report, Willie told police of rumors he had heard that the word on the street was that two men who sold drugs for his son were getting tired of making only $300 a day and were going to take Toeran out. The same document refers to a statement by a different individual, an informant, who said that a man known as Isaiah Glaze stated that Terry Travon and Donley, whom he knew by the name of Capone, were bragging about killing Toeran and Roan.

{¶ 46} Admittedly, the statements contained in these reports are hearsay and might not be admissible. However, they are material, and even if the defense could not directly introduce them at trial, the state's failure to turn them over was highly prejudicial. The defense was deprived of the opportunity to call the original declarants at trial. They were also deprived of the ability to use the statements to cross-examine Donley when he testified at trial.

{¶ 47} Donley was an essential witness for the state who contradicted himself during his testimony at trial and contradicted his earlier statements. He alleged that Brown had made incriminating statements about the murders. This testimony would have taken on a decidedly different character if Donley himself had been implicated in the murders.

{¶ 48} The state responds that even if the reports had been turned over, the outcome of the trial would have been the same because of the magnitude of the evidence against Brown. The state cites, among other things, Brown's failure to dispute that he shot and killed each victim. Brown did, however, deny that he acted with prior calculation and design, and two life sentences for murder is a decidedly different outcome from a sentence of death. Even then, the relevant inquiry is not whether the outcome would more likely than not be different, but whether the verdict is one worthy of confidence. *Kyles*, 514 U.S. at 434, 115 S.Ct. 1555, 131 L.Ed.2d 490. Additionally, trial counsel's decision not to contest

Brown's involvement was based upon the evidence that had been disclosed to them. Had they known that someone else had claimed to have fired the gun that killed Toeran and Roan, they may indeed have changed their strategy.

{¶ 49} As a rule, undisclosed evidence is not material simply because it may have helped the defendant to prepare for trial. The United States Supreme Court has rejected a standard of materiality that focuses "on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, rather than the materiality of the evidence to the issue of guilt or innocence." *Agurs,* 427 U.S. at 112–113, 96 S.Ct. 2392, 49 L.Ed.2d 342, fn. 20. But that rule speaks to the question of materiality, not prejudice. See id.

{¶ 50} Here, the contents of the undisclosed reports are material and offer independent evidence that suggests that Brown did not pull the trigger and that a different party was responsible for the deaths of Toeran and Roan. The significance and materiality of the reports are inherent in their content and do not rest upon how they might have been used by the defense or how the defense might have altered its trial strategy.

### Ineffective Assistance of Counsel

{¶ 51} The failure of the state to comply with *Brady* is not the only factor that undermines confidence in Brown's convictions. Brown's trial counsel are equally at fault.

{¶ 52} Brown claims ineffective assistance of counsel for two reasons. First, counsel failed to have the trial court determine whether he and Wright were married and whether, having been informed of her right to refuse to testify against her spouse, Wright was testifying voluntarily. Second, Brown claims that his counsel failed to file a motion to suppress evidence obtained during his warrantless arrest and the subsequent search of his vehicle and of Wright's apartment.

{¶ 53} To succeed on the claim of ineffective assistance of counsel, Brown must show not only that counsel's performance was deficient, but also that this deficient performance prejudiced him and resulted in an unreliable or unfair outcome. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. There is a strong presumption in favor of the adequacy of counsel, and a defendant must demonstrate that any claimed errors are more than a disagreement over trial strategy. Id. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

### Spousal Competency

{¶ 54} Regarding the competency of a witness to testify, Evid.R. 601 provides that "[e]very person is competent to be a witness except: * * * (B) A spouse testifying against the other spouse charged with a crime except when * * * (2)

the testifying spouse elects to testify." To ensure proper enforcement of this rule, this court has held that "a spouse remains incompetent to testify until she makes a deliberate choice to testify, with knowledge of her right to refuse. The trial judge must take an active role in determining competency, and must make an affirmative determination on the record that the spouse has elected to testify." *State v. Adamson* (1995), 72 Ohio St.3d 431, 650 N.E.2d 875, syllabus.

{¶ 55} Relying on this rule, Brown argues that trial counsel were required to challenge Wright's testimony at a pretrial hearing. Had counsel done so, the trial court would have been required to determine whether Brown and Wright were legally married. If they were married, the trial court would then have been required, under *Adamson*, to determine Wright's competency and to make a finding on the record that she had chosen to testify.[3]

{¶ 56} While the existence of only some evidence of a marriage will not necessitate an *Adamson* instruction, in this case, there is sufficient evidence to support a conclusion that Brown and Wright were legally married for trial counsel to have requested that the judge make a finding on the record. Wright testified that the two had obtained a marriage license on December 29, 2003. That license was introduced into evidence by the state and includes a certification that Arthur Brown, Brown's brother and a minister, had solemnized the marriage on the day it was issued. Bobbi Green, Brown's mother, testified that she and four of her grandchildren had attended the ceremony. Wright, however, also testified that Brown's brother never married them.

{¶ 57} Wright's testimony that she and Brown were never married contradicts her own prior acts and statements as well as Green's testimony. Wright named Brown and her nine-year-old son as beneficiaries on her life insurance policy, and in doing so, listed Brown as her husband. She also sent several letters to Brown while he was in prison, one of which stated, " 'What a hell of a way to start our marriage,' wouldn't you say!" Another letter read: "I dont want no damn annulment and we arent getting no divorce. (When you marry someone you

---

3. Brown does not challenge Wright's testimony on the separate basis of spousal privilege. The general rule of spousal privilege is set forth in R.C. 2945.42 and provides that a "[h]usband or wife shall not testify concerning a communication made by one to the other, or act done by either in the presence of the other, during coverture, unless the communication was made or act done in the known presence or hearing of a third person competent to be a witness." Spousal privilege cannot be waived unilaterally and allows a defendant to prevent his or her spouse from testifying unless one of the statute's exceptions applies. *State v. Rahman* (1986), 23 Ohio St.3d 146, 149, 23 OBR 315, 492 N.E.2d 401. Nonetheless, "[a]n accused may not assert a privilege under R.C. 2945.42 to preclude a spouse from testifying with respect to a crime committed against a third person, where the crime is committed in the known presence of such third person, as well as in the presence of the testifying spouse." *State v. Mowery*, 1 Ohio St.3d 192, 1 OBR 219, 438 N.E.2d 897, paragraph two of the syllabus.

marry that person for better or worst/through the good and bad/richer or poor) through it all."

{¶ 58} Brown's own statements also suggest that he and Wright were married. In letters he wrote to Wright, Brown described himself as her husband, stating, "I tell you I love you in every letter I write to you. * * * This is me! Your husband—remember?" His letters also discuss spousal competency: "I'm your husband, and I will be as long as you want me. I do love you. And can't no court, no where * * * force you to go against your spouse." Although Brown expressed affection for his former girlfriend, Ebony Spivey, in letters he wrote to Spivey, he also held himself out as being married to Wright. In one letter, he told Spivey, "I'm married, but not for long. * * * I don't belong to no one else. I just got to let people think that."

{¶ 59} The state argues that because Wright testified that she and Brown were not married, no inquiry into their legal marital status was required, and Brown suffered no prejudice by his attorneys' failure to challenge her testimony. This argument overlooks the evidence supporting the conclusion that the two were married. Wright's contrary testimony denying the marriage was only one small piece of evidence and was contradicted by her own previous statements and actions.

{¶ 60} Wright may have chosen to testify voluntarily at trial, even after being informed of her right not to do so.[4] However, the rule in *Adamson* is absolute. Once it has been determined that a witness is married to the defendant, the trial court must instruct the witness on spousal competency and make a finding on the record that he or she voluntarily chose to testify. Failure to do so constitutes reversible plain error. *Adamson*, 72 Ohio St.3d at 434, 650 N.E.2d 875. Whether Wright would have still chosen to testify after a proper instruction was given to her is not relevant to the issue of error.

{¶ 61} In this case, the error does not lie with the judge but with Brown's trial counsel. Had the existence of a marriage been undisputed, the judge would have erred by not informing Wright of her right not to testify. However, because there was a question as to whether Brown and Wright were married, it was Brown's trial counsel's obligation to request a formal decision on whether Wright and Brown were actually married.

---

4. There is reason to believe that even if she had been presented with the choice, Wright might have chosen to testify against Brown. She testified at trial that they were not married. Also, several letters Brown wrote to Donley contained what could be interpreted as threats against Wright, telling Donley, "I only got one big obstacle in the way of freedom. I would be grateful for your timely assistance in this matter. * * * I'm gone if that bitch hit[s] the stizzy [the stand]." It would not be surprising, then, if Wright chose to testify against a man whom she denied was her husband.

{¶ 62} The importance of Wright's testimony to the case against Brown cannot be overstated. Wright was the only eyewitness to the murders of Roan and Toeran. Had she been properly advised that it was her choice whether to testify, and had she chosen not to testify, the case against Brown would have been significantly weakened. Although there was physical evidence linking Brown to the scene, Wright provided the vital narrative explaining that evidence and its significance.

{¶ 63} Brown was eligible for the death penalty only because he was convicted of aggravated murder after the jury found that he had acted with prior calculation and design in the death of Roan.[5] Wright is the only one who observed the events of that night. Without her testimony, there would be no firsthand account of Brown's role in the deaths of Toeran and Roan. The fact that she was not properly found competent to testify severely undermines confidence in the jury's verdict because it calls into question whether, in the absence of her testimony, the jury still would have found Brown guilty of the aggravated-murder charge and thus death-eligible.

{¶ 64} The state is correct: physical evidence, as well as the testimony of Donley and Jackson, links Brown to the killings of Toeran and Roan. Nevertheless, Wright was the only eyewitness who testified. Without her testimony, it is questionable whether the state could have proven the prior calculation and design necessary to support the death penalty. And although the only difference might be that of Brown's final sentence, in this case, that difference is monumental—it is the difference between life and death. This difference is enough to explain why Brown was prejudiced by trial counsel's failure to properly raise the issue of Wright's competence to testify.

## Motion to Suppress

{¶ 65} Brown also claims that his warrantless arrest violated the Fourth Amendment of the United States Constitution and therefore his trial counsel were ineffective for failing to file a motion to suppress evidence arising from that arrest. Failing to file a motion to suppress does not constitute ineffective assistance of counsel per se. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 721 N.E.2d 52, quoting *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305. To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis

---

5. The jury found that Brown had acted with prior calculation and design in the death of Roan only. In the propositions of law that we do not address, Brown alleges that this finding was not supported by sufficient evidence because the jury did not find there to be enough evidence to support a conclusion of prior calculation and design in the death of Toeran as well.

to suppress the evidence in question. *State v. Adams,* 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 35.

{¶ 66} A warrantless arrest that is based upon probable cause and occurs in a public place does not violate the Fourth Amendment. *United States v. Watson* (1976), 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598. Warrantless arrests for felony offenses are explicitly permitted in Ohio: R.C. 2935.04 allows for a suspect to be detained until a warrant can be obtained. A reasonably prudent person must, at the time of arrest, believe that the person placed under arrest was committing or had committed a criminal offense. *Gerstein v. Pugh* (1975), 420 U.S. 103, 111–112, 95 S.Ct. 854, 43 L.Ed.2d 54.

{¶ 67} Brown argues that probable cause did not exist for his warrantless arrest because it was based on information from an anonymous tip. He contends that the evidence arising from his arrest would more than likely have been suppressed had his trial counsel filed a motion to suppress. Despite Brown's claim to the contrary, there was sufficient probable cause to justify his stop and subsequent arrest. The police had a tip from an informant detailing Brown's involvement in the murders. Testimony at trial clearly established that Deshon Garrison, a.k.a. "Young Gunner," was the source of the original tip, but a review of the prosecutor's file shows that his identity was not known before Brown's arrest. Even though Brown emphasizes the anonymity of the informant, his identity is not essential to determining whether counsel were ineffective for failing to file a motion to suppress.

{¶ 68} Brown was driving a Cadillac Escalade bearing license plates registered to a Ford when he was arrested. The Cadillac itself was eventually discovered to be stolen. The mismatched plates alone constituted a violation of R.C. 4549.08, which prohibits the unauthorized use of license plates. Thus, the police had probable cause to stop Brown based on readily observable facts. The information gained from Garrison's tip was not necessary to provide probable cause for the stop.

{¶ 69} We cannot say that Brown's trial counsel were required to file a motion to suppress in this case. Such a motion was "not without risks," *Madrigal,* 87 Ohio St.3d at 389, 721 N.E.2d 52, and the likelihood of success was not a given. As this decision regarding trial strategy did not constitute ineffective assistance of counsel, we find Brown's assignment of error on this point to be without merit.

## Conclusion

{¶ 70} Although the *Brady* violation and Brown's claims of ineffective assistance of counsel have been addressed independently, their full effect cannot be appreciated isolated from one another. If they were considered separately, it might be possible to conclude that Brown was not prejudiced, as the state argues.

However, when considered together, these two errors call into question the fundamental fairness of Brown's trial.

{¶ 71} One need look no further than the state's own rationale for why a *Brady* violation did not occur to understand how Brown was prejudiced by the failure of his trial counsel to challenge Wright's marital status. The state relies in part on Wright's testimony to argue that no prejudice occurred in withholding the documents, but review of the record shows that Wright's testimony provides the major evidence against Brown. If Brown's trial counsel had successfully challenged Wright's testimony, the state's argument that its failure to turn over the police reports did not violate *Brady* would have been much weaker. If Brown's trial counsel had known that other people had confessed to the murders, they may have changed their defense strategy entirely.

{¶ 72} Given the gravity of the errors in Brown's trial, we are left with no option other than to remand this case for a new trial. This is not something we do lightly, but we are mindful that ultimately, "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215.

{¶ 73} Because the two errors addressed here compel the order of a new trial, we do not consider Brown's remaining propositions of law.

Judgment vacated
and cause remanded.

MOYER, C.J., PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL and CUPP, JJ., concur.

---

William D. Mason, Cuyahoga County Prosecuting Attorney, and Jon W. Oebker and A. Steven Dever, Assistant Prosecuting Attorneys, for appellee.

John P. Parker and Thomas Rein, for appellant.