[Cite as *State v. Dawson*, 2017-Ohio-5709.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | ) | CASE NO. 15 MA 0081 |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| DEZHANE DAWSON, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the Court of
                             Common Pleas of Mahoning County,
                             Ohio
                             Case No. 14 CR 401C

JUDGMENT:                    Affirmed.

APPEARANCES:

For Plaintiff-Appellee:      Atty. Paul J. Gains
                             Mahoning County Prosecutor
                             Atty. Ralph M. Rivera
                             Assistant Prosecuting Attorney
                             21 West Boardman St., 6th Floor
                             Youngstown, Ohio 44503

For Defendant-Appellant:     Atty. Edward A. Czopur
                             DeGenova & Yarwood, Ltd.
                             42 North Phelps St.
                             Youngstown, OH 44503

JUDGES:

Hon. Carol Ann Robb
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

                             Dated:  June 15, 2017

ROBB, P.J.

{¶1} Defendant-Appellant Dezhane Dawson appeals after being convicted of four felonies in the Mahoning County Common Pleas Court. She contends her trial attorney rendered ineffective assistance of counsel by failing to file a motion to suppress. She believes counsel should have sought to suppress the statement she made at the police station and the evidence discovered upon her consent to search her home and phone, claiming the consent was not voluntary. For the following reasons, the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2} At 10:53 p.m. on April 16, 2014, police were dispatched to North Main Street in Austintown. They observed the victim lying unconscious in the grass near the road. He had a large amount of fresh blood on his head and face and his pants were half-way down (with no sign of underwear). (Tr. 414). Upon briefly gaining consciousness, the victim reported he had been pistol-whipped and robbed by three black males. He pointed to a nearby house and said a woman set him up; the provided name sounded like "Desiree" to the officer. (Tr. 416). After the ambulance arrived, the first-responding officer followed a blood trail up the driveway and down the walkway at the indicated house. There was also blood on the front door. (Tr. 417, 453).

{¶3} Before the officer could knock, Appellant opened the front door and asked, "Is he okay?" (Tr. 419). Appellant allowed the officer to enter the house to check for suspects. (Tr. 418). Appellant gave consent to search her house, and she later gave consent to search her phone. (Tr. 478-479). The consent was both verbal and written. The officer saw a large amount of blood on the carpet in front of the couch, which Appellant had attempted to clean. He observed a broken vase in the kitchen; pieces of the vase were on the floor and in the trash. (Tr. 418-419). He also found what was believed to be the victim's torn and bloody underwear in the trash. (Tr. 608).

{¶4} Appellant advised police the victim came over around 10:00 p.m. to provide her with money as her mother was incarcerated. (Tr. 421, 604). She

claimed: Izay Jackson and two other black males entered her house without her permission; Jackson pushed her upstairs while a commotion occurred downstairs; the two males asked, "what do you have on you?" and told the victim to pull his pants down. (Tr. 421-422). Appellant said the victim walked out of the house and down the street after the attack. (Tr. 422).

{¶5} Appellant unlocked her phone for a lieutenant; she also disabled the lock feature so he could review her phone later without a password. (Tr. 479-480). The lieutenant told her he would return the phone soon. He performed an information extraction in the morning and thereby obtained the remaining call and text information from her phone. (Tr. 482). The extraction report was admitted as evidence.

{¶6} As to texts with the victim: the victim texted Appellant at 9:13 p.m. telling her he had something for her; she told him not to come or he would get his feelings hurt; and the victim then explained he had money and pills for her. (Tr. 489-491). At 11:18 p.m., Appellant received a text from an unidentified number which said, "He aint [sic] got 6 babe its only 2900." (Tr. 491). As $6,000 was the amount the victim mentioned to the first-responding officer, suspicions about Appellant's involvement were further raised. (Tr. 499). Appellant responded to this number at 11:20 p.m. by stating, "Man get me the Fuck up out of here." (Tr. 493). A response at 11:21 p.m. asked, "Ok u ready now." (Tr. 494).

{¶7} On April 17, 2014, the day after the assault, the lieutenant went to Appellant's house to return her phone. When confronted with the texts, Appellant admitted she participated in those texts and said the unidentified number belonged to a phone she gave to Izay Jackson two days before the assault. (Tr. 499). She began crying and admitted she was involved in setting up the victim to be robbed by Izay Jackson. Appellant said she told Jackson the victim had money on him when he was with her the night prior to the robbery and assured Jackson the victim was not known to carry a gun. (Tr. 501). She did not know the other two men. (Tr. 502). Appellant then brought the lieutenant to an apartment complex and pointed out where Izay Jackson's family purportedly lived. (Tr. 503).

**{¶8}** On April 22, 2014, Appellant agreed to provide a recorded statement at the Austintown Police Department. At the beginning of the recorded interview, a detective advised Appellant she was not in custody and was free to leave at any time. (Tr. 647). During the interview, Appellant admitted she made up the name Izay Jackson to replace the actual culprit who was Jasan Martin. (Tr. 506, 630). She said Martin had a key to her house. (Tr. 506). She also specified the victim bragged about having $6,000. (Tr. 629). She disclosed she was cleaning the vase remnants when police arrived; she was worried Martin's DNA could be discovered on the shards as he cut his hand (requiring stitches). (Tr. 508, 634-635). After Martin was arrested, he called Appellant. In a recorded call from jail, Appellant explained she deleted all her texts before the police arrived, except the one referring to $2,900. (Tr. 639). Martin eventually provided police with information about the two other men. (Tr. 630).

**{¶9}** The emergency room physician testified the victim arrived at the hospital unresponsive and the paramedics were using a bag to maintain his breathing. (Tr. 437). A muscle relaxer was provided for intubation. (Tr. 439-440). The victim was diagnosed with respiratory failure, head injury, and concussion. (Tr. 441).

**{¶10}** The victim testified he began a physical relationship with Appellant in February 2014. (Tr. 320, 342). On the night of the assault, he was bringing Appellant some money, and she knew he had more money. (Tr. 322-323, 376, 378). He said he had $3,100 in his underwear pocket. (Tr. 323). His sister dropped him off at Appellant's house around 10:00 p.m. He noticed Appellant was texting a lot and acting "weird" when he arrived. He was going to leave, but Appellant asked him to stay. (Tr. 321). The victim heard a noise, Appellant left the bedroom, three men entered, and Appellant went upstairs with the first man. (Tr. 324-325). A second man hit the victim on the forehead with a gun, and a third man hit him on the knees with something like a bat. (Tr. 325-326). They held him down and stripped him of his clothes. (Tr. 326). They dragged him into different rooms. Near the end, the first man hit the victim over the head with a vase; when the vase did not break, he hit him

with it again. (Tr. 327-328). Appellant never asked them to stop; nor did she assist the victim after the assault or call 911. (Tr. 328).

{¶11} Appellant testified in her own defense. She said she was 18 with no juvenile or criminal record. She lived with her mother in the house in Austintown until her mother was incarcerated. (Tr. 701). She stopped going to school upon her mother's incarceration, noting her mother never finished school. (Tr. 705). Appellant attended a special class as she had difficulty reading. (Tr. 703-704). She disclosed she abused pills such as Tramadol (an opioid) and Xanax. (Tr. 706).

{¶12} After her mother's incarceration, she entered a relationship with Jasan Martin, with whom her mother had been in a relationship. (Tr. 706-707, 709). Martin brought her money, drugs, and alcohol and would stay at her house for weeks at a time. (Tr. 710). At the same time, she was in a relationship with the victim; she said he brought her pills and money as well. (Tr. 706, 710, 712). Martin knew about her relationship with the victim, but the victim did not know about her relationship with Martin.

{¶13} Appellant testified Martin was at her house when the victim texted to say he was coming over. She instructed Martin to go upstairs while she spent time with the victim in the downstairs bedroom. She told Martin the victim had $6,000 and was bringing her some money. She testified she merely told Martin she would split whatever money the victim gave her. (Tr. 719). Appellant claimed she did not plan the robbery and did not know what Martin was thinking. (Tr. 723). She admitted she deleted some texts immediately after the robbery. (Tr. 750). Sometime after the robbery, Martin gave her $500 so she would stay quiet; she could tell some of the money was fake. (Tr. 747). She said he threatened to kill her. (Tr. 717). She noted she voluntarily went to the police station on April 22, 2014 to provide her final statement. (Tr. 746).

{¶14} Appellant was convicted of aggravated robbery (charged in two alternative forms), felonious assault (charged in two alternative forms), kidnapping, and obstructing justice. She was acquitted of accompanying firearm specifications. The court imposed three six-year sentences (for aggravated robbery, felonious

assault, and kidnapping) and a thirty-six-month sentence (for obstructing justice), all to run concurrently for a total sentence of six years. Appellant filed a timely notice of appeal from the May 29, 2015 sentencing entry. Both of Appellant's assignments of error raise ineffective assistance of counsel due to the failure to file a motion to suppress.

### LAW ON SUPPRESSION & INEFFECTIVE ASSISTANCE OF COUNSEL

**{¶15}** Where a suppression motion has been filed, appellate review of a suppression decision presents a mixed question of law and fact. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. Legal conclusions are reviewed de novo. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. However, factual decisions are afforded great deference. *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). This is because the trial court is the fact-finder who occupies the best position from which to resolve factual questions, evaluate the credibility of witnesses, and weigh the evidence. *See State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992).

**{¶16}** Where a suppression motion was not filed, the defendant can attempt to argue ineffective assistance of counsel due to the failure to seek suppression of certain evidence. Defense counsel's failure to file a motion to suppress is subject to the two-pronged *Strickland* analysis for claims of ineffective assistance of counsel. *State v. Spaulding*, __ Ohio St.3d __, 2016-Ohio-8126, __ N.E.3d __, ¶ 94, citing *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Pursuant to *Strickland*, the defendant must demonstrate: (1) trial counsel's performance was deficient in that it fell below an objective standard of reasonableness as determined by prevailing professional norms while realizing there is a strong presumption counsel's conduct fell within the wide range of reasonable assistance; and (2) there is a reasonable probability that, but for defense counsel's unprofessional error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 689, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The defendant's failure to satisfy one prong of the test negates a court's

obligation to consider the other prong. *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000).

**{¶17}** More specifically, where a defendant complains trial counsel failed to file a suppression motion, the defendant must prove there was a valid ground to suppress the evidence in dispute. *Spaulding*, __ Ohio St.3d __, 2016-Ohio-8126 at ¶ 94, citing *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65. The defendant must also show there is a reasonable probability the result of the trial would have been different if the evidence had been suppressed. *Spaulding*, __ Ohio St.3d __, 2016-Ohio-8126 at ¶ 94.

**{¶18}** Lastly, a claim of ineffective assistance of counsel in a direct appeal must be established by the evidence in the record. *See, e.g., State v. Hartman*, 93 Ohio St.3d 274, 299, 754 N.E.2d 1150 (2001) (if establishing ineffective assistance of counsel requires proof outside the record, then such claim is not appropriately considered on direct appeal); *State v. Ishmail*, 54 Ohio St.2d 402, 406, 377 N.E.2d 500 (1978) (the appellate court is limited to what transpired as reflected by the record on direct appeal). If the record developed at trial is inadequate to support the unraised suppression argument, a defendant's ineffective assistance of counsel argument can be overruled. *See, e.g., State v. Gervin*, 3d Dist. No. 9-15-51, 2016-Ohio-5670, ¶ 23.

## ASSIGNMENT OF ERROR ONE

**{¶19}** Appellant sets forth two assignments of error, the first of which provides:

"Appellant was denied the effective assistance of counsel guaranteed by both the United States and Ohio Constitutions in that trial counsel failed to file a motion to suppress various statements made by Appellant after her right to counsel had attached."

**{¶20}** Trial counsel did not file a motion to suppress before trial. Appellant contends a motion to suppress the April 22, 2014 videorecorded statement would have been successful if made. She states her defense was prejudiced as her April 22, 2014 statement was a confession which provided the details of her involvement.

She concludes this interview resulted in information "that formed the cornerstone of the prosecution against her."

**{¶21}** As grounds for suppression, Appellant asserts: "All times following April 17, 2014, when Appellant was speaking to the police, especially during the April 22, 2014 interview at Austintown P.D., were 'critical stages' in Appellant's prosecution thereby entitling her to counsel." She states "the interview of Appellant at the Austintown Police Department was a critical stage of the process" due to its location at the police department and the status of the investigation at the time (the interview occurred after the police decided she would be charged). Appellant concludes she should have been *Mirandized* in order to inform her of her right to counsel.

**{¶22}** The states responds by pointing out there was no invocation of the right to counsel and *Miranda* is only triggered by a custodial interrogation. The state notes an interview at a police station does not automatically make the interview custodial even if the suspect is driven there in a police car, citing *State v. Coleman*, 7th Dist. No. 06 MA 41, 2007-Ohio-1573, ¶ 16. The state points to the advisement provided to Appellant by the detective before the recorded interview where he explained she was not in custody and was free to leave at any time, citing to the transcript at pages 647-648.

**{¶23}** In general, if an accused clearly invokes her constitutional right to counsel during an interrogation, the interrogation must stop until an attorney is present. *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, ¶ 18 ("No cessation of questioning is required if the request is ambiguous"), citing *Davis v. United States* (1994), 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) ("must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney"). *See also Arizona v. Roberson*, 486 U.S. 675, 677, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988); *Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Here, although Appellant refers to her right to counsel attaching, Appellant does not contend she invoked her right to counsel.

Instead, she suggests that she was denied her right to invoke counsel by the lack of *Miranda* warnings.

{¶24} Prior to a custodial interrogation, the defendant must be informed of her right against self-incrimination and right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The need to provide *Miranda* warnings is only triggered by a *custodial* interrogation. *State v. Mason*, 82 Ohio St.3d 144, 153, 694 N.E.2d 932 (1998), citing *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 313, 882 L.Ed.2d 317 (1984). If there was no formal arrest, then to establish custody there must be a restraint on the defendant's freedom of movement to a degree associated with a formal arrest. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 351, 777 L.Ed.2d 1275 (1983) ("the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest"). To determine whether a custodial interrogation occurred, a trial court faced with a suppression motion is to evaluate how a reasonable person in the defendant's position would understand the situation. *Mason*, 82 Ohio St.3d at 154, citing *Berkemer*, 468 U.S. at 442.

{¶25} Police are not required to administer *Miranda* warnings to everyone they question, even if the subject is a suspect. *State v. Biros*, 78 Ohio St.3d 426, 440, 678 N.E.2d 891 (1997). In *Mason*, the Ohio Supreme Court found an interview of a suspect at a police station did not per se trigger *Miranda* even where the suspect was driven from his home to the station in a patrol car. *Mason*, 82 Ohio St.3d at 153-154 (suspect agreed to come to station for further interview, was cooperative, was not handcuffed, was not told he could not leave, and was left alone at times in an unlocked interview room).

{¶26} Here, the evidence in the record does not suggest a suppression motion would have been granted on this ground. There was no formal or informal arrest. As aforementioned, it is not dispositive that Appellant was transported to the police station by a detective. *See Mason*, 82 Ohio St.3d at 153-154. We note Appellant had no license or vehicle. (Tr. 718). *See State v. Lux*, 2d Dist. No. 2010 CA 30, 2012-Ohio-112, ¶ 30 (referring to the "courtesy ride" to the police station for

an interview after incriminating statements were made at the suspect's house). Moreover, the fact Appellant could have been arrested after her statement at her house on April 17, 2014 does not mean the interview on April 22, 2014 was custodial. *See, e.g., Biros*, 78 Ohio St.3d at 440 (police need not administer *Miranda* warnings to subject being questioned merely because the subject was a suspect); *Lux*, 2d Dist. No. 2010 CA 30 at ¶ 31, 33 (the existence of probable cause to arrest did not convert a voluntary interview into a custodial one).

**{¶27}** The detective testified he did not feel the need to read Appellant her rights because she was "[a]bsolutely not" in custody on April 22, 2014 and "[s]he did, absolutely" come of her own free will. More importantly, the detective explained:

> I made it clear to her when I went to pick her up that I would like her to come to the APD because I would like to record the interview. I made it clear to her that she did not have to come with me. Once we got to the APD, it's right on the video recording, you understand that you are not in custody and you understand that you can leave at any time. You are here of your own free will, and she acknowledged that.

(Tr. 647-648). Appellant had already provided a statement on April 17 and was memorializing the statement in recorded format. According to her own testimony, she went to the police station voluntarily. (Tr. 746).

**{¶28}** In sum, the evidence in the record suggests an absence of custody during the April 22, 2014 interview. There is no evidence in the record showing the police imposed a restraint on Appellant's freedom of movement to a degree associated with a formal arrest which would lead a reasonable person to believe her freedom was restrained. In accordance, this court concludes defense counsel did not render ineffective assistance of counsel by refraining from filing a motion to suppress based on the lack of *Miranda* warnings. This assignment of error is overruled.

ASSIGNMENT OF ERROR TWO

**{¶29}** Appellant's second assignment of error provides:

"Appellant was denied the effective assistance of counsel guaranteed by both the United States and Ohio Constitutions in that trial court failed to file a motion to suppress the purported 'consent search' of Appellant's home and cellphone."

**{¶30}** Appellant argues a motion to suppress the evidence obtained from her consent to search her residence and phone would have been successful if trial counsel had filed such a motion. She asserts her defense was prejudiced by the text messages which suggested her complicity in the robbery and which played a pivotal role in her conviction. As grounds for the suppression motion, she contends her consent was not voluntarily given. She recognizes the state need not prove her knowledge of the right to refuse consent but claims the circumstances viewed in their totality weigh in her favor on the issue of whether her consent was voluntary. She notes she was young (18) and uneducated with a low level of intelligence. She points out she had no criminal or juvenile record and had no reason to know she could have refused to give consent.

**{¶31}** The state responds by noting the absence of evidence suggesting her consent was the product of duress or coercion. The state points out the question of whether consent was voluntary is a question of fact left to the trial court. The state concludes the record contains no evidence showing a motion to suppress evidence obtained due to Appellant's consent would have been warranted.

**{¶32}** A search conducted pursuant to consent is a well-settled exception to the constitutional warrant and probable cause requirements. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (a search authorized by consent is wholly valid). The voluntariness of consent to search is defined by whether the defendant's "will has been overborne and his capacity for self-determination critically impaired * * *." *Id.* at 225.

**{¶33}** To ascertain whether a defendant's will was overborne in a particular case, a court is to consider the totality of all surrounding circumstances. *Id.* at 226-227. Some pertinent factors may be: the youth of the accused; lack of education; low intelligence; lack of advice on constitutional rights; length and nature of any detention or absence of detention; and use of physical punishment such as the

deprivation of food or sleep. *See id.* at 226 (suggesting relevance of factors used in ascertaining voluntariness of a confession). *See also State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 39 (finding consent voluntary where: defendant was not under arrest or restrained in any manner; the police made no threats or promises to obtain his cooperation; there was no indication he was under the influence of drugs or alcohol; and there was no indication he did not understand the consequences of signing the consent-to-search form).

**{¶34}** The government need not establish the defendant knew of the right to refuse consent, but this can be a consideration. *Id.* at 227. "Low intelligence and lack of education do not negate the voluntariness of his consent to search. Low intelligence is a factor in determining whether consent was voluntary, but it is not necessarily the decisive factor." *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 69 (2003). The ultimate question is whether a consent to a search was voluntary or whether it was the product of duress or coercion, express or implied. *Schneckloth*, 412 U.S. at 227.

**{¶35}** We note in evaluating deficient performance for failure to file a suppression motion, the court must consider whether counsel made a tactical decision after fully investigating the case. *Madrigal*, 87 Ohio St.3d at 389 (a suppression motion is not without risks). *See also State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 29-32 (counsel may allow certain evidence to enter evidence unchallenged in order to avoid the risk of having the defendant take the stand, where counsel had not yet ascertained whether the defendant was going to testify). Counsel may have determined Appellant's consent to search her residence and phone could help establish her lack of complicity. In any event, there must be evidence in the record as to the validity of the grounds for a suppression motion.

**{¶36}** Here, police found an unconscious man in the grass near an intersection upon responding to an emergency call. The victim's face and head were covered in fresh blood. Upon briefly gaining consciousness, the victim pointed at Appellant's house and accused her of setting him up to be robbed of thousands in

cash by three black males, adding he had been pistol-whipped. A police officer followed a blood trail down the driveway to Appellant's door which was also bloody. She opened the front door before the officer knocked. The officer spotted an obvious attempt to clean blood from the carpet in the living room. Appellant allowed the officer to enter her house, and she provided a story about intruders. Appellant gave consent to search her house. The consent was verbal and then written. The officer noticed an attempt to remove a broken vase and found the victim's bloody underwear in the trash. When a phone was spotted in a bedroom, Appellant gave consent to search it. She entered the phone's passcode and then disabled the passcode function so the phone could be searched later.

{¶37} Appellant's assignment of error refers to the consent to search the residence and the phone. Appellant does not discuss plain view or the exigencies of the situation with regards to destruction of evidence in the residence, such as her cleaning of blood from the carpet and her disposal of the shards of the vase where blood and DNA evidence may have been present. In any event, her argument on prejudice refers to the evidence obtained *from the phone*, stating this evidence played a pivotal role in her conviction. For instance, the police recovered a text telling Appellant, "he aint [sic] got 6 babe its only 2900" along with Appellant's response, "Man get me the Fuck up out of here."

{¶38} Appellant focuses on her young age (18), lack of completed education, purported low intelligence, and lack of a criminal or juvenile record (from which experience with the justice system could be inferred). Appellant testified in her own defense. She disclosed she did not stay in school after her mother went to prison. (Tr. 705). When she was in school, she was in a special class with one-on-one interaction as she had a hard time reading. (Tr. 703-704). She said she did not write well. (Tr. 703).

{¶39} However, the victim had a relationship with Appellant and believed they were close. When asked how smart he thought Appellant was, the victim answered "she got common sense." (Tr. 392). When defense counsel asked the victim if he

noticed Appellant had "limited intellectual abilities," he responded in the negative. (Tr. 393).

**{¶40}** When the detective-lieutenant was asked by defense counsel if he thought Appellant "was smart or dumb," he said he formed no opinion. (Tr. 520-521). He added, "She had no problem comprehending me. I had no problem comprehending her. * * * I would say she fully understood what was going on." (Tr. 520). He also spoke to Appellant the day after the assault and on April 22, 2014. On redirect, it was established that, in all of the conversations he had with Appellant, he was never concerned about her understanding of the conversations. (Tr. 571).

**{¶41}** Furthermore, Appellant independently wrote her own statement for police on the night of the incident. (Tr. 421-422). The statement, which was over a page long, was admitted as an exhibit. (Tr. 695). We also note the trial court opined at sentencing, "we're dealing with the mentality of a young woman who is uneducated but I believe very savvy, very bright." (Sent.Tr. 12).

**{¶42}** As to other considerations, Appellant did not appear to be under the influence of drugs or alcohol. (Tr. 520). She was in her own house and was not in custody. The record indicates she was attempting to portray the appearance of a cooperative witness/victim, who claimed intruders broke into her house, pushed her upstairs, and assaulted the victim. The record also suggests she thought she had deleted the incriminating texts from her phone before the police arrived. From the record before this court, there is no evidence of police duress or coercion, express or implied. There was no police misconduct. There is no suggestion of misleading statements or promises. The totality of the circumstances on voluntariness as gleaned from the record before this court does not establish a suppression motion would have been granted. In accordance, this court concludes Appellant has not demonstrated ineffective assistance of counsel for failing to file a motion to suppress due to the lack of voluntary consent. This assignment of error is overruled.

**{¶43}** For all of the foregoing reasons, the trial court's judgment is affirmed.

Waite, J., concurs.

DeGenaro, J., concurs.