[Cite as *State v. Agee*, 2017-Ohio-8164.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 104915

---

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LAKETTA AGEE

DEFENDANT-APPELLANT

---

### JUDGMENT:
### REVERSED; CONVICTION VACATED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-601102-A

**BEFORE:** Laster Mays, J., McCormack, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** October 12, 2017

**ATTORNEY FOR APPELLANT**

John P. Parker
988 East 185th Street
Cleveland, Ohio 44119


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

By:   Gregory Paul
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

ANITA LASTER MAYS, J.:

{¶1} Defendant-appellant, Laketta Agee ("Agee"), appeals her convictions for two third-degree felonies involving the illegal possession of food stamps secured by falsifying reporting documents. The matter is reversed and remanded; the convictions are vacated.

## I. Background and Facts

{¶2} Count 1 of the indictment alleges that Agee violated R.C. 2913.46(B), generically referred to as trafficking food stamps:

On or about January 20, 2013 to December 31, 2014 * * * [Agee] did: knowingly possess, buy, sell, use, alter, accept, or transfer supplemental nutrition assistance program benefits, WIC program benefits, or any electronically transferred benefit, or any women, infants, and children program coupon in a manner not authorized by the "Food Stamp Act of 1977," 91 Stat. 958, U.S.C.A. 2011, as amended, and/or the "Child Nutrition Act of 1966," 80 Stat. 885, 42 U.S.C.A. 1786, as amended and the aggregate face value of the supplemental nutrition assistance program benefits plus coupons provided under the "Child Nutrition Act of 1966," 80 Stat. 885, 42 U.S.C.A. 1786, as amended, plus the aggregate value of the electronically transferred benefits involved in the violation was seven thousand five hundred dollars or more and was less than one hundred fifty thousand dollars.

{¶3} Count 2 asserts that Agee tampered with (falsified) records in violation of R.C. 2913.42(A)(1):

On or about January 20, 2013 to December 31, 2014 * * * [Agee] did, knowing she had no privilege to do so, and with purpose to defraud or knowing she was facilitating a fraud on ODJFS [Ohio Department of Jobs and Family Services], falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record, to wit: Interim

Reports, and the writing, data, computer software, or record was kept by or belonged to a local, state, or federal governmental entity.

The state asserts that Agee received a $7,550 overpayment of food stamp benefits for her family of four over a period of almost two years.

**{¶4}** Specifically, the state alleged that Agee failed to report to the Cuyahoga County Department of Job and Family Services ("CCDJFS") that she received self-employment income between March 2013 and December 2014. The tampering charge is based on the "knowing" omission of self-employment income based on two interim reports submitted to CCDJFS documenting her current income status. It is undisputed that Agee reported the self-employment income for tax purposes.

**{¶5}** Agee rejected a diversion program requiring a plea of guilt, maintaining her innocence. The case proceeded to a one-day bench trial on July 13, 2016.

**A.      CCDJFS**

**{¶6}** CCDJFS investigator Fred Sims ("Sims") was the sole trial witness for the state. Sims had served as a CCDJFS investigator for several assistance programs including the Ohio Food Assistance Program, the state extension of the federal Supplemental Nutrition Assistance Program ("SNAP") for 17 years. Sims's total involvement with Agee's case was the receipt of Agee's file from the investigator who actually conducted the investigation, and Sims's alleged review of the file contents.

**{¶7}** Investigators and case workers have access to the CCDJFS computer system. The system contains a database of benefit recipients and provides economic status change alerts triggered by inter-agency submissions such as income tax filings, employment

documents, lottery winnings, and bank account activities or by hotline complaints relating to the recipients and their household members. The information was not always received by CCDJFS in a timely manner. "[A] case worker who is really on his or her game will check their alerts weekly." (Tr. 30.) Sims also stated that the case worker position has a high turnover rate.

{¶8} Sims's personal investigation protocol included checking on income for the prior six months to see if the client reported the information in issue. Next, he consulted a "DESL" screen that provided information on the client's income sources. Where the suspected income is from self-employment, Sims would also request tax records or receipts for the time involved. However, Sims did not conduct any components of Agee's investigation. Investigator Walsh ("Walsh") initiated and completed the investigation. Walsh is no longer with the CCDJFS. "Walsh simply gave me the file." (Tr. 35.)

{¶9} Sims estimated that tens of thousands of people in Cuyahoga County receive SNAP benefits. He offered that the predominant way to file SNAP applications and renewal applications during the 2012 through 2014 period was through face-to-face meetings with case workers. CCDJFS began accepting on-line applications "about two years ago, though case workers have been slow to use it, preferring walk-in applications. Also about that time, individuals were allowed to submit interim reports by telephone." (Tr. 37.) Again, Sims was never a case worker.

**{¶10}** Agee's initial application for assistance[1] was filed on October 10, 2012, and she reported the monthly income amount for federal Veterans' Administration ("VA") disability benefits as $251 per month.[2] According to Sims, recipients are required to submit interim reports approximately every six months to confirm or report any changes in economic status. "[D]rastic" income changes were to be reported promptly, for example, if the change caused the income to exceed the household poverty income ceiling, so the benefit amount may redetermined and adjusted. (Tr. 50.)

**{¶11}** Sims explained that the application also disclosed the applicant's obligation to advise CCDJFS of status changes to the application income information. During cross-examination, Sims admitted that there is no language on the application advising the applicant of the ongoing duty to report changes in income.

**{¶12}** Sims confirmed that Agee would be required to report an increase in income that causes the household poverty limit to be exceeded within ten days after the month in which the increase occurred, after which the overpayment rule is triggered requiring repayment. If the earned income changed but the change did not put the household income over the poverty limit, there are no repercussions, "[t]hen nothing occurs." (Tr. 57-58.)

---

[1] Counsel for the parties stipulated that the CCDJFS documents produced as exhibits were authentic business records.

[2] The household income ceilings are stated in annual terms but the focus is on the monthly income amount.

**{¶13}** The typewritten name contained in the February 7, 2013 interim report is that of Keith Agee, Agee's husband, though the form is signed by Laketta Agee. The case worker listed on the report is P. Patterson. Sims did not know why the husband's name was on the form, "[m]aybe he was the person who came in that day." (Tr. 85.)

**{¶14}** The report information was consistent with that of the initial application. In response to the inquiry about changes in income and employment status since the last interim or application form, Agee checked the box indicating "no or I have already reported the change and gave proof to county contact." Sims stated there was "no indication in the case notes" that Agee had informed the case worker of any income changes. Sims also testified that the interim forms recite the status update requirements, including penalties for fraud, failure to comply with the rules, and advising that CCDJFS is authorized to make whatever contacts are necessary to determine eligibility.

**{¶15}** The next interim report admitted into evidence is dated August 8, 2014, approximately one and one-half years after the February 7, 2013 report. The monthly income amount reported is $950. Sims testified the source is VA benefits, though the source is not listed on the form. Sims speculated that the lapse of time between reports was possibly due to: (1) a failure by Agee to submit the report; (2) the failure of the case workers to contact Agee to fill in the report; or (3) there may have been an intervening interim report that was incomplete or "may not have been used." (Tr. 59.) The CCDJFS case worker listed is different than that of the February 2013 report. Sims did

not know whether there was a change in case workers or the prior case worker was not available.

{¶16} Sims also could not say which case workers had "human contact" with Agee, but did state that the name at the top of the interim report would be that of the individual that Agee dealt with at the time of submission. "And usually, as a rule, we usually subpoena those people, bring them in [to testify]." (Tr. 83.)

{¶17} During cross-examination, Sims confirmed that the August 8, 2014 interim report contained a reported income of $950, and that the report also indicated that Agee was to "report changes that have occurred since your last reapplication date,[March 10, 2014]". Below that line is the statement, "[i]f you have already reported and provided proof of a change, you do not need to report that change on this form; however, you still need to return this form or sign this form online." (Tr. 91.)

{¶18} Sims stated he did not know what happened to the referenced March 10, 2014 interim report, but he gave it his best shot, "It may have been in the file and incomplete, which was why the investigator probably didn't use it, if it did occur." (Tr. 91.) "If you're a decent investigator, you're going to go for the one that's complete." (Tr. 92.) Sims then surmised, "I'm saying when it was screened in[to the agency data base], it probably was lost." (Tr. 92.)

{¶19} Asked to confirm that the form indicates that Agee appeared at CCDJFS on March 10, 2014, to fill out the report, Sims responded, "I understand you're saying she reported the [$]950 then. * * * But that still might not be true." (Tr. 92.) Though the

report does not specify, Sims also determined that the $950 listed in the August 8, 2014 interim report was solely from "veteran's benefits." Sims did not know how much of the information on the interim report forms was preprinted prior to receipt by the benefits recipient to execute and return. "I'm not a caseworker. I can't tell you how they would generate it." (Tr. 94.)

{¶20} Sims testified that an income alert surfaced in early 2015 indicating that, during the 2013 to 2014 period, Agee received income from self-employment. It did not appear to Sims that Agee reported the information to CCDJFS. Sims was unable to determine whether a case worker or investigator contacted Agee to secure the 2013 and 2014 federal 1040 income forms, or whether the records were requested by subpoena, correspondence, or telephone call. Sims did say that Agee submitted the required information.

{¶21} During cross-examination, Sims's file review recollection was refreshed by the contents of a memorandum prepared by Walsh, the actual investigator. CCDJFS mailed a request for contact to Agee on April 28, 2015, seeking submission of her 2014 tax return documenting self-employment earnings by May 8, 2015. CCDJFS received Agee's submission on May 7, 2015. An administrative subpoena was mailed to Agee on August 21, 2015, seeking a copy of Agee's 2013 tax return that she also promptly provided.

{¶22} The 2014 tax return was jointly filed by Agee and her husband. The listed adjusted gross income of $14,921 for self-employment was, to Sims's knowledge, not

made known to CCDJFS. The 2014 tax filing reflects self-employment income of $15,010. CCDJFS determined that the overpayment period began March 1, 2013, and ended December 2014. The overpayment amount of $7,750 is "based on the agency re-budgeting the household monthly income" using the tax filings. (Tr. 72.)

{¶23} According to Sims, benefit overpayments in excess of $1,000 are automatically referred to the prosecutor's office due to "policy, rule and law." (Tr. 73.) Sims was not sure what law contained the $1,000 trigger figure but thought it might be contained in the Ohio Revised Code or the food stamp handbook. Sims confirmed that the excess overpayments procedure was governed by the "Intentional Violations Program" when reminded by counsel for the state. (Tr. 73.)

{¶24} Violations due to a CCDJFS error remain with CCDJFS and do not go to court. "[O]ccasionally, you have agency errors where the agency knows and failed to act." (Tr. 73.) It is not CCDJFS's policy to ask the benefits recipient for an explanation of the apparent discrepancy, though an investigator has the discretion to do so. According to investigator Walsh's memorandum, CCDJFS made no attempt to discuss the situation with Agee.

{¶25} A CCDJFS internet website printout was introduced into evidence during cross-examination that contained a chart of income limits for food stamp benefits qualification. According to the chart, a family of four whose income is $2,584 a month is entitled to receive $649 in monthly assistance. Sims clarified that the duty to report a status change is triggered once the income level exceeds the stated poverty level by 130

percent. According to the chart, Agee's income did not exceed the poverty level, but Sims asserted that Agee lost eligibility due to the information contained in the interim reporting documents:

> SIMS: [W]e have never denied they were not eligible, based upon the poverty limit, which is what you're saying. We're saying they're *not eligible based on the fact that fraudulent documents were used while obtaining the benefits*.

(Emphasis added.) (Tr. 82.)

{¶26} Sims was unable to produce the CCDJFS form indicating that Agee acknowledged the duty to report income that is in excess of the poverty level and confirmed that he "couldn't testify she was told that." (Tr. 102.) Sims admitted that he could not produce any evidence proving that the amount of income received by Agee as of the February 8, 2013 report was not accurate. "That's why we use the 1040, in the event we cannot [identify actual monthly income], we don't have month to month incomes, we take the 1040 and prorate it over the year." (Tr. 85.)

{¶27} At the close of CCDJFS's case, Agee moved for judgment of acquittal under Crim.R. 29, arguing that CCDJFS failed to establish that Agee knowingly trafficked or illegally used food stamps, or knowingly and with purpose to defraud falsified interim reports. CCDJFS countered that the evidence demonstrated: (1) that Agee accepted food stamps in a manner not authorized by the Child Nutrition Act, and (2) that Agee falsified all of the documents, including the initial report, arguing that the mere submission of the reports was sufficient for falsification. The trial court denied Agee's motion.

## B. Agee

**{¶28}** Agee, who was 36 years of age when indicted, had been married for 12 years, and the couple had two children. Agee had no criminal record. Before joining the military in 2004, Agee worked as a supervisor for an airport food services company where she was entrusted to handle daily cash deposits involving $10,000 to $20,000 per day. After military basic and job training, Agee served as a finance specialist/technician at Fort Drum, New York.

**{¶29}** Agee was honorably discharged in 2006 and returned to work for her previous civilian employer at the airport. In 2012, Agee left the position to attend college funded by VA benefits. She received her associate's degree at a community college and an undergraduate degree from a local college with a double major in finance and accounting.

**{¶30}** Agee also obtained an Ohio cosmetology and managing license prior to beginning college. She received assignments as an independent contractor from a company that provided stylists to nursing homes. At the time that Agee applied for food stamps in 2013, she was also receiving medical assistance benefits from the county for the two children.

**{¶31}** Agee explained that, when she originally filled out the food stamp application, she received the benefit approval letter in the mail. Agee subsequently received letters notifying her of telephonic redetermination appointments. A case worker would call and ask about changes in income or household status. The case worker would

type up the interim report and mail it to her for signature. As instructed, Agee took the signed reports to CCDJFS where she would "take a number" and the people at the front desk scanned the form into their system. "I guess it goes to your worker." (Tr. 117.) A follow-up letter was signed by Agee after the submission, denying or approving the updated information and setting forth the amount of benefits.

{¶32}    The $251 amount on the February 8, 2013 report was for her regular VA disability monthly payment. The $950 in income on the August 8, 2014 report stems from informing her case worker of status change information during the telephone appointment.

{¶33} Agee reported that, in addition to the VA disability payment, she received a VA school benefit. VA paid tuition to the institution, and Agee received a small amount for "food or mileage or gas." (Tr. 119.) The benefits were paid 30 days after school started, and were based on the number of credits taken. No education benefits were received during the summer.[3]

{¶34} Agee also told her case worker about the self-employment hair styling services and that the income fluctuated from $100 on one day to $300 for an entire month. The case worker inserted the $950 amount, possibly by coming up with an average figure, though Agee had no actual knowledge how the case worker arrived at the figure.

{¶35}    Agee received redetermination appointment letters every four to six months, and testified that at least two interim reports resulting from telephonic

---

[3]   The VA education benefit is not in issue.

redetermination appointments were submitted between the February 2013 and August 2014 reports. Agee did not know exactly what amounts were contained in the missing interim reports, "[b]ut, it could be anywhere between 6 to 12 hundred dollars." (Tr. 121.) The number of credits taken by Agee and her hair styling income varied as she sometimes suffered from chemotherapy side effects. Agee insisted that she was truthful and forthcoming with the case workers about her income.

{¶36} In 2015, Agee promptly delivered a copy of her 2014 self-employment tax filing to CCDJFS's office in response to a telephone request from the case worker. A month or two later, she received a subpoena in the mail requesting copies of tax filings for prior years. Agee states that she also responded to that request, but resent the information upon receipt of a second notice. The next correspondence received by Agee was the initiation of the legal proceedings. CCDJFS never informed her that there was a problem or contacted her to discuss the matter.

{¶37} Agee, who testified that she was not really familiar with the food stamp process, stated her belief that she was entitled to the food stamps since her income was under the poverty limit based on the county benefits chart:

> COUNSEL: Do you feel at any time that you tried to deceive the county, either about your income or your eligibility or anything about your family.
>
> AGEE: No. That was probably my first time I ever got food stamps. I always paid for myself.

(Tr. 125.)

**{¶38}** Agee reiterated during cross-examination that she reported the income to the case workers and that at least two redetermination forms were missing and not in evidence. Agee also confirmed that CCDJFS never talked with her regarding the basis for the tax information requests and only wanted the tax information, though she maintained a journal documenting when she had styling appointments.

**{¶39}** Agee renewed her motion for judgment of acquittal under Crim.R. 29, and the state incorporated its previous arguments in rebuttal. The motion was again denied. The trial court found Agee guilty of both charges.

## II.     Assignments of Error

**{¶40}**     Agee proffers eight assignments of error:

I.      The state presented insufficient evidence during its case in chief that the exhibits and testimonial evidence the factfinder relied upon linked the identity of Agee to the convictions beyond a reasonable doubt.

II.     The state presented insufficient evidence that appellant violated the Food Stamp Act and/or the Child Nutrition Act.

III.    The state presented insufficient evidence that appellant tampered with records in violation of R.C. 2913.42(A)(1).

IV.    Counsel was ineffective under *Strickland*[4] when he stipulated to business records and their  authenticity and failed to object to their admission into evidence.

V.     The convictions are not supported by the manifest weight of the evidence.

---

[4]    *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

VI.   Mrs. Agee was denied due process by CCDJFS's failure to maintain redetermination exhibits/forms that were exculpatory; the documents were material, would have exonerated Mrs. Agee and were otherwise destroyed or lost in bad faith.

VII.  Counsel was ineffective for failure to move to dismiss case for spoilation of evidence in violation of *Trombetta*[5] and *Youngblood*.[6]

VIII. The cumulative errors deprived Mrs. Agee of a fundamentally fair trial in violation of due process under the Fourteenth Amendment and *State v. Brown*, 115 Ohio St.3d 55, 873 N.E.2d 858 (2007).

## III.   Law and Analysis.

### A.   Sufficiency of the Evidence

#### 1.   Standard of Review

**{¶41}**   We merge the errors challenging the sufficiency of the evidence as we find them to be dispositive of this case.   "Sufficiency of the evidence" is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law.   *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).   Due process is violated by a conviction that is "based on legally insufficient evidence."   *Id.*, citing *Tibbs v. Florida,* 457 U.S. 31, 45, 102   S.Ct. 2211, 72 L.Ed.2d 652 (1982), citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

**{¶42}**   In a sufficiency inquiry, an appellate court does not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial

---

[5]   *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984).

[6]   *Arizona v. Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988).

supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387.

> "[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L. Ed. 2d 560 (1979).

*State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77.

### 2. Discussion

### a. Food Stamps

{¶43} Agee was convicted in Count 1 for trafficking in or illegal use of food stamps, R.C. 2913.46(B):

> No individual shall knowingly possess, buy, sell, use, alter, accept, or transfer supplemental nutrition assistance program benefits, WIC program benefits, or any electronically transferred benefit in any manner not authorized by the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.) or section 17 of the "Child Nutrition Act of 1966," 80 Stat. 885, 42 U.S.C. 1786, as amended.

{¶44} Research reveals that there have not been a great number of convictions under this statute, and those that do exist primarily involved illegal food stamp activities engaged in by stores that accepted food stamps. *See*, *e.g.*, *State v. Midtown Ctr. Mkt.,* 8th Dist. Cuyahoga No. 68508, 1996 Ohio App. LEXIS 67 (Jan. 11, 1996).

{¶45} Cases before this court involving individual food stamp recipients are not as numerous and involve relatively egregious circumstances. In *State v. Hall*, 8th Dist. Cuyahoga No. 90366, 2009-Ohio-462, we affirmed Hall's conviction for multiple charges

including theft, engaging in a pattern of corrupt activity, 10 counts of tampering with records, 51 counts of forgery, money laundering, and illegal use of food stamps. Hall was convicted under the 2008 version of R.C. 2913.46(B) which is similar to the current statute, "[n]o individual shall *knowingly* possess, buy, sell, use, alter, accept, or transfer food stamp coupons." (Emphasis added.) *Id.* at ¶ 7.

{¶46} Hall received $16,249 worth of food stamps and challenged the sufficiency of the evidence. *Id*. at ¶ 10. The evidence demonstrated that Hall owned a home, held multiple credit cards, had more than one million dollars in cash in various safety deposit boxes, but stated on her food stamp application that she had no assets. We found the evidence to be sufficient to demonstrate the elements of the charges. *Id.* at ¶ 12.

{¶47} In *State v. Roberts*, 8th Dist. Cuyahoga No. 84949, 2005-Ohio-2615, Roberts applied for recertification of a teaching license under the name of Charmaine Woods due to Roberts's prior felony conviction. *Id.* at ¶ 2. Further investigation revealed that Roberts had also been receiving food stamps and other government benefits under the Woods name over the past years. *Id*. at ¶ 3-4.

{¶48} Roberts was indicted for illegal use of food stamps (R.C. 2913.46), theft (R.C. 2913.02), and three counts of tampering with records (R.C. 2913.42). *Id*. at ¶ 4. While Roberts's argument was that the statute of limitations had expired, the facts serve as an example of the type of conduct that exemplifies "knowing" violations of the trafficking and tampering with records statutes.

**{¶49}** CCDJFS suggests that our decision be guided by *State v. Ziemba*, 9th Dist. Summit No. 25886, 2012-Ohio-1717.   In 2007, Ziemba applied to the Summit County Department of Job and Family Services for food stamp assistance, and reported that her three daughters resided with her.   Her daughters did not live with her after October 2007, but she did not report the change in household status, making her ineligible for over $14,000 of benefits received.   Ziemba's ex-husband notified the CCDJFS.   *Id.* at ¶ 2.

**{¶50}**   Ziemba was indicted for theft (R.C. 2913.02(A)(3)),[7] tampering with records (R.C. 2913.42(A)(1)(B)(4)), and illegal use of food stamps (R.C. 2913.46(B)):

> No individual shall knowingly possess, buy, sell, use, alter, accept, or transfer food stamp coupons, WIC program benefits, or any electronically transferred benefit in any manner not authorized by the "Food Stamp Act of 1977," 91 Stat. 958, 7 U.S.C.A. 2011, as amended, or section 17 of the "Child Nutrition Act of 1966," 80 Stat. 885, 42 U.S.C.A. 1786, as amended.

*Id.* at ¶ 8, citing former R.C. 2913.46(B).[8]

**{¶51}**   A jury found Ziemba guilty of all charges, and she was sentenced to 24 months of community control.   Ziemba's appeal included a challenge to the sufficiency of the evidence.   Evidence in support of the conviction included:   (1) stipulation by the parties that the ex-husband assumed custody of the children on October 29, 2007; (2) testimony by two fraud investigators, one of whom actually performed the investigation;

---

[7] Unlike other illegal food stamp use cases against individuals entertained by this court, Agee was not charged with theft.

[8]   The food stamp statute was revised on October 16, 2009, to incorporate changes reflecting amendments to the federal "Food and Nutrition Act of 2008." The amendments do not impact the analysis for purposes of this case.

and (3) testimony of a case manager who personally met with Ziemba at the time of her initial application and "each time Ziemba renewed her request for assistance." *Id.* at ¶ 16.

**{¶52}** "Multiple [CCDJFS] witnesses * * * testified that Ziemba was not entitled to the full amount of benefits she received because she misrepresented her eligibility requirements." *Id*. at ¶ 17. The case manager personally reviewed the forms with Ziemba, and advised her of the income reporting responsibilities, yet Ziemba continued to misrepresent the size of her household.

**{¶53}** The court considered whether the mens rea of the statute had been established. R.C. 2901.22(B) defines the culpable mental state of "knowingly": A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{¶54}** The *Ziemba* witnesses provided evidence based on personal knowledge.

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.

Evid.R. 602. The witnesses who testified were directly involved with the case and with Ziemba, establishing her direct knowledge of the reporting requirements. The trial court found that there was sufficient evidence to demonstrate that Ziemba "*knowingly* accepted benefits to which she was not entitled by repeatedly providing DJFS with false information." (Emphasis added.) *Ziemba*, 9th Dist. Summit No. 25886, 2012-Ohio-1717, at ¶ 17.

{¶55} A trial court has broad discretion in admitting or excluding evidence. *In re H.A.I.*, 8th Dist. Cuyahoga No. 97771, 2012-Ohio-3816, ¶ 52, citing *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985). In the case of *In re H.A.I.,* we held that the trial court did not abridge Evid.R. 602 or abuse its discretion in allowing a social worker to testify about the contents of a case file because she had been working with the family for several years and thus had "first-hand personal knowledge" about the family. *Id*. at ¶ 54.

{¶56} In stark contrast to *Ziemba* and *In re H.A.I*, the state in this case presented a single "witness" against Agee. Sims had no involvement whatsoever with the case and, throughout his testimony, speculated about what "might" have happened, "should" have happened, or "could" have happened. Sims sought to establish Agee's knowledge of the reporting requirements by arguing that the information was contained in the initial application, but retracted that testimony when a review of the document revealed the information was not in the document. Sims also asserted that a case worker "would

have" explained the reporting requirements to her, but later admitted that he did not know if that had ever occurred.

**{¶57}** Sims, who had only served as an investigator, never a case worker, testified to what case workers and investigators would typically do, but had no first-hand knowledge of what happened in this case. Not a single individual testified who was actually involved with Agee's case, in spite of Sims's testimony that "usually, as a rule, we usually subpoena those people, bring them in." (Tr. 81.)[9]

**{¶58}** Though the burden is on CCDJFS to establish the elements of its case, CCDJFS asserts that Agee is, in fact, responsible for failing to produce CCDJFS's records documenting that there was at least one interim report prior to the August 8, 2014 report. This is so even though Agee and Sims both testified that reports were required approximately every six months.

**{¶59}** The August 8, 2014 report lists the "last re-application date" as March 10, 2014. Below that language, it states that the income contained in the March report listed a "[t]otal gross income (both earned and unearned income), at $950." Only the case worker who prepared the documents knows the actual basis for the $950 figure, and that individual did not testify. Sims further speculated about what "might" have happened to the March report and also determined that the source of the $950 was VA benefits, though the report does not specify.

---

[9] Ironically, a review of the record reflects that, during discovery, the sole witness identified by the state to testify in this case was investigator Walsh.

**{¶60}** Sims also testified that the reporting requirements were triggered by exceeding the poverty limit requirements by more than 130 percent. Though Agee did not exceed that limit, the state determined that the mere submission of the interim reports[10] was sufficient to find Agee guilty of the cited charges.

### b. Tampering with Records

**{¶61}** R.C. 2913.42(A)(1) provides:

(A) No person, *knowing* the person has no privilege to do so, *and with purpose to defraud or knowing that the person is facilitating a fraud,* shall do any of the following:

(1) Falsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record.

(Emphasis added.) *Id*.

**{¶62}** The highly speculative nature of CCDJFS's evidence also fails to demonstrate that Agee's act of executing the reports was "knowing * * * and with a purpose to defraud." Agee testified that she truthfully provided information and that she did not know how the case worker arrived at the figure inserted in the interim report submitted for Agee's signature.

**{¶63}** Sims could only offer that the tax information was averaged to determine a monthly income, and that it appeared the investigator did not seek any other information

---

[10] We note here that the state's argument, in response to the initial Crim.R. 29 motion, that the mere submission of the reports constituted a violation of the statute would convert the statute to strict liability status.

from Agee to allow her to address the issue. Even where faced with information contained in the state's interim report exhibit indicating the submission of at least one prior report containing knowledge of a change in income, the absence for which could not be explained, the state argues that Agee was required to explain the absence. The burden of proof is the state's responsibility. As stated previously, Sims was never Agee's case worker. In fact, Sims was never a case worker. Sims never personally investigated Agee's case, talked with Agee, or met Agee. Sims merely received Agee's file, and his testimony regarding Agee's knowledge was purely speculative.

**{¶64}** Illustrative here as to the sufficiency of the evidence and CCDJFS's failure to meet its burden of proof, is the statement by Sims regarding the various workers whose names appeared on the case documents. "[U]sually, as a rule, we usually subpoena those people, bring them in." (Tr. 81.) The failure to follow that protocol underlies our decision here that, when viewed in a light favorable to the prosecution, the evidence in this case was insufficient to convict Agee of the charges.[11] The state failed to meet its burden of proof as to the mens rea element of the charges.

**{¶65}** Our finding that the evidence was insufficient to support Agee's convictions, renders her manifest weight challenge moot. App.R. 12(A)(1)(c); *State v.*

---

[11] While Agee stipulated to the CCDJFS documents, the extent of that stipulation was to "authenticity or that they are held as business records." The stipulation is not a stipulation to the factual accuracy of those documents. *See Thompson v. White Gravel Chapel Church*, 4th Dist. Scioto No. CA 1370, 1982 Ohio App. LEXIS 5951, 6 (Jan. 1, 1982) ("there is a decided difference between stipulating authenticity and stipulating correctness.").

*Shabazz*, 8th Dist. Cuyahoga No. 100021, 2014-Ohio-1828, ¶ 46.  Our determination further serves to moot the remaining arguments.

**{¶66}**  Appellant's first assignment of error is sustained.

**{¶67}**  Judgment is reversed; conviction vacated.

It is ordered that appellant recover from appellee costs herein.

The court finds that there were reasonable grounds for the appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
ANITA LASTER MAYS, JUDGE

TIM McCORMACK, P.J., CONCURS WITH SEPARATE OPINION;
FRANK D. CELEBREZZE, JR., J., CONCURS IN JUDGMENT ONLY


TIM McCORMACK, P.J., CONCURRING:

**{¶68}**  I find there was insufficient evidence to support the conviction, plain and simple.   For this reason, I concur.