[Cite as *State v. Jones*, 2020-Ohio-1007.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 18AP-541 |
| v. | : | (C.P.C. No. 15CR-2207) |
| Desiree C. Jones, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 17, 2020

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Daniel J. Stanley*, for appellee. **Argued:** *Daniel J. Stanley.*

**On brief:** *Siewert & Gjostein Co. LPA*, and *Thomas A. Gjostein*, for appellant. **Argued:** *Thomas A. Gjostein.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendant-appellant, Desiree C. Jones, appeals a May 30, 2018 judgment entered by the Franklin County Court of Common Pleas by which she is convicted of obstruction of justice with a firearm specification and having a weapon under disability. The trial court sentenced Jones to 36 months in prison for her convictions. Jones' two assignments of error in this appeal (claiming ineffective assistance of counsel for not filing a motion to suppress and that her convictions for obstructing justice and having a weapon under disability were based on insufficient evidence and were against the manifest weight of the evidence) are not well-taken and are overruled. We thus affirm the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On May 5, 2015, a Franklin County Grand Jury indicted Jones for tampering with evidence, obstruction of justice, and having a weapon while under disability. (May 5, 2015 Indictment.) The tampering and obstruction charges were accompanied by one-year

firearm specifications for having control of a firearm while committing the offense. *Id.* Jones pled "not guilty" and, after the failure of plea negotiations, on January 30, 2018 a trial began in the case. (July 24, 2015 Plea Form; Tr. at 1-35.[1])

{¶ 3} Jones waived jury as to the weapon under disability offense but the remaining counts and specifications were tried to a jury. (Tr. at 36-37.) At trial, six witnesses testified—the lead detective in the case, a crime scene search detective, two crime lab workers, a records custodian who monitors telephone calls made from the Franklin County jail, and Jones herself. Because many factual issues in this case ultimately are uncontested, we factually focus on the testimony of three witnesses, the lead detective, a crime lab worker who was qualified as an expert in DNA analysis, and Jones.

{¶ 4} The first witness to testify was the lead detective in the case, Ronda Siniff. (Tr. at 70.) Siniff testified that on March 16, 2016 she was called to 177 Fountain Lane where officers discovered the body of an elderly woman, Anna Ferriman, who had been shot and then set on fire. (Tr. at 71-72; State's Ex. F5.) Jones' son, Jeremay Jones, was arrested near the scene and a gun was recovered near where he was arrested. (Tr. at 157-58.) Ballistics testing determined that the gun found at the time of Jeremay's[2] arrest was the gun that fatally shot Ferriman. (Tr. at 73-74.) The officer who arrested Jeremay apparently observed two suspects together and, faced with the inability to pursue both, chose to pursue Jeremay. (Tr. at 158.) The second suspect in the death of Ferriman has not been identified. (Tr. at 78.)

{¶ 5} The detective testified (and another witness subsequently confirmed) that calls from the Franklin County jail are recorded and reviewed. (Tr. at 80, 222-30.) Siniff explained that she listened to a number of calls between Jeremay and his mother. (Tr. at 84-88.) Three of these calls were played during trial and were introduced as exhibits. (Tr. at 92-122; State's Exs. A1, A2, A3.)

{¶ 6} In one of the calls, Jeremay read a portion of the indictment against him to his mother. (Tr. at 100-02.) Based on a misinterpretation of language defining an "occupied structure" in relation to the offense of aggravated burglary, Desiree Jones

---

[1] The transcript of trial and all ancillary proceedings in this case was filed in four consecutively paginated volumes on January 25, 2019. Because of the consecutive pagination, we cite it merely by page number and omit the volume reference.

[2] Because Desiree Jones and her son, Jeremay Jones, share a last name, for the sake of clarity we have elected to refer to Jeremay Jones by his first name. No informality is intended.

concluded that the police had a witness to the murder Jeremay had committed.  (Tr. at 102.)
The following detailed conversation ensued:

> DESIREE JONES: Then they got a witness. They got a witness.
>
> JEREMAY JONES: I don't - - I don't - - is that what that mean? I don't think that's what it said. I'm just thinking it means when her and the person other than her.
>
> DESIREE JONES: No, what they saying is they got a - - they saying that they got somebody to testify against you, that's what that person, the witness, means. That they got somebody there that can say that they were there at the scene of the incident, that can say what happened. So now what I need you to do is, I hope you ordered some envelopes because I need you to write me some names down. I know you saying your boy know what's up, but I need you - -
>
> JEREMAY JONES: Mom, I need you to stop talking as much because this shit is still - - or anyhow.
>
> DESIREE JONES: Right.
>
> JEREMAY JONES: I know what you're talking about.
>
> DESIREE JONES: Yeah, I mean, I know, I'm not saying nothing that's going to incriminate you. I'm just saying you need to write me a letter about everything, that's where it is right now. So that I can take it further. They trying to say they got somebody - - they trying to say - - the reason why they can indict you is because basically the number one thing they got is a person.
>
> JEREMAY JONES: Uh-huh.
>
> DESIREE JONES: So now I need you to write me and tell - -
>
> JEREMAY JONES: Got you.
>
> DESIREE JONES: I mean, you know what I'm saying?
>
> JEREMAY JONES: I got you. I got you.

(Tr. at 102-04.)

{¶ 7}    Next in her testimony, Siniff identified a recording of a call that was played for the jury where Jeremay gave his mother detailed directions to a vacant lot near the home where he murdered Ferriman.  (Tr. at 109-17, 171-72.)  Both sides of the conversation make

it appear that Jones was driving to the site and retrieved a gun (other than the murder weapon, which was already in the custody of police):

> DESIREE JONES: I'm currently rolling down Country Club.
>
> JEREMAY JONES: You make that right on that first street behind that little auto shop, behind the UDF and shit make a right.
>
> DESIREE JONES: Oh, nope, I got to turn around. I was waiting for you to call back and I proceeded down Country Club.
>
> JEREMAY JONES: Yeah, it was the first street to the right.
>
> [interruption in playback to identify the participants]
>
> DESIREE JONES: I got to turn around, turn around, turn around. (Unintelligible). Okay. You said I'm turning right behind the UDF?
>
> JEREMAY JONES: Well, if you turned - - if you turned around, it's going to have to be a left.
>
> DESIREE JONES: Okay.
>
> JEREMAY JONES: But it's if you going notice it (unintelligible), it's like the last strip.
>
> DESIREE JONES: Am I supposed to be turning into this donut place thing is right here? I'm at this - -
>
> JEREMAY JONES: It's like a car shop?
>
> DESIREE JONES: Yeah, am I supposed to turn this brake shop thing?
>
> JEREMAY JONES: No. No. No. No, you going on the street back there on the street.
>
> DESIREE JONES: Okay. Hold on.
>
> JEREMAY JONES: Like if you would have turned on Country Club from Main.
>
> DESIREE JONES: Uh-huh.
>
> JEREMAY JONES: If you look at the Country Club from Main where the UDF at, make a right on the first street. It like a little

- - it like a little grassy, little area right there on the right-hand side, on the corner, like a grassy area.

DESIREE JONES: So I turn left on the Country Club and then right on the first street coming from the Country Club?

JEREMAY JONES: Coming from Main, yeah.

DESIREE JONES: Okay. I got that. Okay. I busted the right (unintelligible).

JEREMAY JONES: But you turned on that street?

DESIREE JONES: Yeah. And then it's got a street to the left or keep straight?

JEREMAY JONES: Keep straight. Go down to the bend, drive down to the bend and - - and pull into the bend in little, it's like a cul-de-sac looking thing, it's like a half a cul-de-sac, pull in there and you going to see a walkway through like in a yard. You can tell it used to be a yard and the house burnt down, that house is tore down, it's like a bunch of trees and shit. You can tell it's like a walkway and a path.

DESIREE JONES: Okay. So coming up to the ever pine you said I'm supposed to be coming up to something that was like a little cul-de-sac?

JEREMAY JONES: Yeah, you see it?

DESIREE JONES: Up to the right, right here.

JEREMAY JONES: Yeah.

DESIREE JONES: And on Taylor Avenue.

JEREMAY JONES: Yep.

DESIREE JONES: Okay. Am I supposed to go up to one of these houses or something?

JEREMAY JONES: No, just park on the cul-de-sac, you see that yard where some - - them trees is at, but there ain't no house right there?

DESIREE JONES: Yeah.

JEREMAY JONES: It's the only one - - park in front of that and then walk through the little cut.

DESIREE JONES: Okay. Okay. So walk into the cut.

JEREMAY JONES: All right. You see the little path, where the path will naturally take you?

DESIREE JONES: Yeah, the red - - little red (unintelligible).

JEREMAY JONES: Yeah, the little bristle, little road.

DESIREE JONES: Yeah.

JEREMAY JONES: All right. Walk up a bit.

DESIREE JONES: Am I supposed to (unintelligible).

JEREMAY JONES: Naw, but the fence should be boarded up unless somebody kicked it back out. You don't got to go past that though.

DESIREE JONES: Like - -

JEREMAY JONES: Somebody kicked it back out?

DESIREE JONES: Yeah.

JEREMAY JONES: All right.  Stop.  Now, make a little - - look to the right, do you see like a board right there like a - - like a table or something, it look like a table?

DESIREE JONES: Oh, wait a minute, it ain't kicked out, they did board it back up.

JEREMAY JONES: All right.

DESIREE JONES: Okay.

JEREMAY JONES: But do you see the little, like a table little thing like a fence, like a fence that was broke down?

DESIREE JONES: Yeah.

JEREMAY JONES: Walk - -

DESIREE JONES: Yeah.

JEREMAY JONES: Walk until your feet stop at like where the fence begin at, okay.

DESIREE JONES: Okay.

JEREMAY JONES: You stop right there and it's like - - do it look like you could put you - -

DESIREE JONES: (Unintelligible).

JEREMAY JONES: Huh?

DESIREE JONES: So don't - - so don't go through this little cubbyhole?

JEREMAY JONES: Don't go through the cubbyhole, look down at your right foot, where your right foot would be at but on the other side of that fence.

DESIREE JONES: Look at my right foot and the other side, but don't go through it.

JEREMAY JONES: Don't go through it, just look over it and look down where your right foot would be at, it should be right there.

DESIREE JONES: Okay.

JEREMAY JONES: Yeah?

DESIREE JONES: Yeah.

JEREMAY JONES: Okay.

DESIREE JONES: Yeah.

JEREMAY JONES: Yeah?

DESIREE JONES: Yeah.

JEREMAY JONES: All right.

DESIREE JONES: Okay.

JEREMAY JONES: Be careful though, be careful, all right.

DESIREE JONES: Uh-huh.

JEREMAY JONES: And you going to have to put some oil on it.

DESIREE JONES: Okay.

JEREMAY JONES: All right.  That's all, yeah. And do whatever you got - - do whatever you got to do with that.

DESIREE JONES: Okay.  Okay.  Is this the main?

JEREMAY JONES: Huh?

DESIREE JONES: This the main?

JEREMAY JONES: The what?

DESIREE JONES: The main?

JEREMAY JONES: What you mean?

DESIREE JONES: The main?

JEREMAY JONES: The main one?

DESIREE JONES: Yes.

JEREMAY JONES: No, they got it.

DESIREE JONES: Oh.

JEREMAY JONES: That's another one.

DESIREE JONES: Okay. Okay. (Unintelligible).

JEREMAY JONES: All right.  Now, like I - - let me think.  Let me think.  Let me think.  At the end of the day - - at the end of the day whatever you do with it ain't nobody going to be able to (unintelligible) ain't nobody goin to be able to use it until they take it apart.  And I'll teach you how to take it apart over the phone.

DESIREE JONES: (Unintelligible).

JEREMAY JONES: Huh?

DESIREE JONES: I said leave it alone.

JEREMAY JONES: All right.  Well, you see the name on it side of it, YouTube it and find out the way I don't got - - you feel me? Just YouTube it and find out.

DESIREE JONES: Right. I'm just coming out, I'm just trying to note, I see a car at the end of the street pulling off. You know me, I'm just - - you know me, I'm just over cautious.

JEREMAY JONES: Right. No, you're supposed to be.

DESIREE JONES: Yeah. So I just want to go totally the opposite direction of how you came in (unintelligible) I'm going to figure it out.

(Tr. at 109-18.)

{¶ 8}   After reviewing this third telephone conversation between Jeremay and his mother, Siniff traced the route described.  (Tr. at 134-35; State's Exs. B1-B2, C1-C11.)  She also obtained a search warrant for Jones' home and executed the warrant.  (Tr. at 147-48.)  During the search, the police found a loaded gun with a model name and number imprinted on the side.  (Tr. at 149-50, 152, 205.)  The crime scene search detective and Siniff testified that the gun was found inside a purse on the top shelf of a closet in the same bedroom where police recovered the cellular telephone to which the jail calls had been placed.  (Tr. at 205; Tr. at 181-82; State's Ex. G1 at 3.)  The gun bore light rust in the gap between the slide and the lower receiver.[3]  (Tr. at 150-51.)  A crime lab worker testified later in the trial and confirmed that the gun, despite the rust, was operable.  (Tr. at 195-96; State's Ex. D.)

{¶ 9}   Although Siniff agreed that law enforcement personnel were not investigating Jeremay for any crimes other than those for which he was indicted, she explained that they were still looking for an additional suspect and were interested in any other weapons that might have been involved in the aggravated burglary and murder of Ferriman.  (Tr. at 184-87.)  Specifically, Siniff agreed that the police knew there was likely another person involved in the robbery and murder of Ferriman and that person may also have possessed a firearm.  (Tr. at 186.)

{¶ 10}   The final witness to testify for the State was an expert in DNA and biology with the crime lab.  (Tr. at 236-37.)  She testified that gun grips, being porous or textured, are generally good surfaces from which to collect DNA and that, with modern technology, they often get so much DNA from such surfaces, that they obtain DNA from most people who have ever touched the gun.  (Tr. at 243-44.)  However, she said they obtained no useable DNA data from the gun recovered from Jones' home.  (Tr. at 245-47.)  She testified that sometimes DNA is recovered from items left out in the elements for several days.  (Tr.

---

[3] The photographs of the pistol (State's Exs. S32-S34) do not show the rust.  However, it is visible on a physical inspection of the weapon. (State's Ex. T2.)

at 248.)  She agreed that wiping a gun, oiling it, or placing it in a cloth bag could wipe DNA off of it.  (Tr. at 248-49.)

{¶ 11}  The final witness to testify in the case was Jones.  She admitted that, while on the phone with her son, intending to help him if she could, she drove out to the lot where the gun had been placed.  (Tr. at 276-78, 295.)  She said, however, that she changed her mind about picking it up when asked her son if it was the "main one."  *Id.* at 278.  She said at that point she began thinking of her other three children and did not want to mess up her nice clothing by going into the underbrush.  *Id.* at 278-79, 291-92.  Consequently, she did not retrieve the gun.  *Id.*  However, she said she carried on the charade of having retrieved the gun with Jeremay on the phone in order to allay his temper and placate him.  (Tr. at 291-94.)

{¶ 12}  Regarding the gun found in her home, Jones said that shortly after her mother died in 2010, Jones was involved in an abusive relationship with a man.  (Tr. at 283-84.)  When she forced him to leave her home, he attempted to have her arrested by calling the police and planting presumably contraband items in her house while the police where there.  (Tr. at 284-86.)  She theorized that the gun was left behind by him as part of that plot.  *Id.*  She said the purse in which the gun was found had belonged to her mother and she denied looking inside the purse since the time of her mother's death in 2010.  (Tr. at 286-87.)

{¶ 13}  On cross-examination, Jones eventually admitted that, in a jail call she made while being held in this case, she asked the caller whether the officers who had searched her house had dumped the purses out.  (Tr. at 317-19.)  She also admitted stating that she knew there "was a BB gun [in] there," but simultaneously denied knowing what was in the purse that contained the firearm.  *Id.*  She later clarified that Jeremay had a BB gun and she thought it was in the house.  (Tr. at 328-29, 334.)  She claimed to have been concerned about the purses being emptied out because she wanted to know what the searchers had done to her room and was concerned about some money she had collected to help Jeremay pay legal expenses.  (Tr. at 326-29.)

{¶ 14}  In closing, the defense argued that Jones was telling the truth—that she had gone to the site where the gun was located but had not taken action.  (Tr. at 387.)  As the defense put it, the jury had to "decide whether or not she took action.  If she did, you have

to convict her." *Id.* But the defense argued that she had abandoned her criminal purpose and aborted her mission to retrieve the gun. *Id.* Following closings, the trial court released Jones (who was still on bond) for lunch. (Tr. at 439.) Jones never returned from lunch and when the verdict was announced in court, it was publicly read in her absence. (Tr. at 443-53.)

{¶ 15} On May 24, 2018, after Jones was arrested on a warrant, the trial court reconvened to address three matters—the trial of the weapon under disability charge, a plea to a new charge of failure to appear, and sentencing for all convictions. (Tr. at 460.) The parties stipulated to Jones' prior disqualifying record underlying the weapon under disability charge, and the trial court found Jones guilty of having a weapon under disability. (Tr. at 461-66.) Jones then pled guilty on the new failure to appear case. (Tr. at 466-67, 474.) The trial court concluded that the tampering and obstruction charges merged under the facts of this case and the prosecution elected to proceed on the obstruction charge. (Tr. at 482-83.) Ultimately, the court sentenced Jones to serve 18 months for obstruction, plus a consecutive 12 months for the firearm specification, and a concurrent 12 months for the weapon under disability offense. (Tr. at 501-03.) The court ordered Jones to serve that 30-month prison term consecutively to 6 months it imposed on the failure to appear case. *Id.*

{¶ 16} Jones now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 17} Jones raises two assignments of error:

> [1.] THE APPELLANT HAD HIS [sic] RIGHTS TO DUE PROCESS OF LAW VIOLATED UNDER ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AMENDMENT OF THE UNITED STATES CONSTITUTION, IN BEING COMPELLED TO STAND TRIAL WHEN TRIAL COUNSEL RENDERED INEFFECTIVE FOR FAILING TO FILE A MOTION TO SUPPRESS THE SEARCH WARRANT EXECUTED IN THIS CASE.

> [2.] APPELLANT'S CONVICTION [sic] WAS [sic] NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1 & 16 OF THE OHIO CONSTITUTION, AND THE CONVICTION[sic] WAS [sic] ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. DISCUSSION

### A. First Assignment of Error – Whether Trial Counsel was Ineffective in not Filing a Motion to Suppress

{¶ 18} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "In evaluating counsel's performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances the challenged action "might be considered sound trial strategy." ' " *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 37, quoting *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). To show that a defendant has been prejudiced by counsel's deficient performance, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694; *see also State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

{¶ 19} Particularly on the topic of whether counsel becomes ineffective by failing to file a motion to suppress, the Supreme Court of Ohio has explained:

> Failing to file a motion to suppress does not constitute ineffective assistance of counsel per se. *State v. Madrigal* (2000), 87 Ohio St.3d 378, 389, 2000 Ohio 448, 721 N.E.2d 52, quoting *Kimmelman v. Morrison* (1986), 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305. To establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question. *State v. Adams*, 103 Ohio St.3d 508, 2004 Ohio 5845, 817 N.E.2d 29, ¶ 35.

*State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, ¶ 65.

{¶ 20} Not only does Jones not "prove that there was a basis to suppress" the evidence discovered during the warrant search of her home, she does not even suggest a basis for such a motion. (Jones' Brief at 4, 8.) Rather, she merely argues that, had a motion

to suppress been filed, the question of the admission of the evidence "would have been placed before the Trial Court to decide if the rights of Appellant were prejudiced." *Id.* at 4. We find nothing in the appellate record that would permit us to conclude that Jones' counsel should have filed a motion to suppress and especially on what evidentiary grounds. Jones' first assignment of error is overruled.

### B. Second Assignment of Error – Whether Jones' Conviction for Obstruction and Having a Weapon Under Disability were Insufficiently Supported or Against the Manifest Weight of the Evidence

{¶ 21} In her second assignment of error, Jones appears to allege that all three of the offenses for which she was indicted were not supported by sufficient evidence and were against the manifest weight of the evidence. (Jones' Brief at 9.) However, the plaintiff-appellee, State of Ohio, did not elect to proceed at sentencing against Jones on the first count in the indictment for tampering with evidence. (May 30, 2018 Jgmt. Entry at 1.) This was because the trial court determined tampering with evidence to be an allied offense to obstruction of justice as charged in Count 2 of the indictment. *Id.*; *see also* Tr. at 482-84. Thus, although the indictment contained two counts for the same conduct and although Jones was found guilty of both, she was "convicted of only one." R.C. 2941.25(A). Hence, we consider only whether her convictions for obstructing justice and having a weapon under disability were sufficiently supported or against the manifest weight of the evidence.

{¶ 22} The Supreme Court has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990). In manifest weight analysis, "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida.* 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and

determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 23} In contrast, sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's* at 1433. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991) paragraph two of the syllabus.

{¶ 24} As relevant to this case, obstructing justice is defined as follows:

> (A) No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime, * * * shall do any of the following:
>
> * * *
>
> (4) Destroy or conceal physical evidence of the crime or act[.]
>
> * * *
>
> (B) A person may be prosecuted for, and may be convicted of * * * a violation of division (A) of this section regardless of whether the person * * * aided ultimately is apprehended for * * * committing the crime or act * * *. The crime or act the person* * * aided [] shall be used under division (C) of this section in determining the penalty for the violation of division (A) of this section, regardless of whether the person * * * aided ultimately is apprehended for * * * committing the crime or act the person* * * aided [].
>
> (C)

(1) Whoever violates this section is guilty of obstructing justice.

\* \* \*

(4) Except as otherwise provided in division (C)(6) of this section, if the crime committed by the person aided is aggravated murder, murder, or a felony of the first or second degree \* \* \* and if the offender knows or has reason to believe that the crime committed by the person aided is one of those offenses \* \* \*, obstructing justice is a felony of the third degree.

R.C. 2921.32(A), (B), and (C).

{¶ 25} Jones argues that she never admitted to having picked up the gun; the audio recording contains no extraneous noises to suggest that she crunched through brush or shifted rubble to pick up something, and that she shut down her son's attempts to tell her how to disassemble and clean it by telling him to "leave it alone." (Jones' Brief at 12-13.) Jones concludes that these observations render the evidence against her so thin that "[t]he clear and rational inference would have been for this jury, rather, any jury to have seen through this lack of evidence." *Id.* at 13. We disagree.

{¶ 26} The evidence established, and Jones admitted, that she drove out near the scene of the murder with the intent to help her son by retrieving a weapon. (Tr. at 109-18, 276-78, 295.) Although it was not the murder weapon, its proximity to the scene and the fact that her son wanted her to retrieve it, all created an inference that it was used somehow in the offense against Ferriman and was potentially incriminating, if not directly of him, then perhaps of an accomplice. (Tr. at 73-74, 78, 157-59, 184-87.) Jones asserted that she then renounced that purpose when she asked her son if it was the "main," meaning the one used to kill Ferriman. (Tr. at 278-79, 291-94.) While it is true that the audio recording does not include soft background sounds such as Jones walking through the overgrown lot, it also does not include other soft background sounds such as the car's engine or turn signal as Jones drove. (State's Ex. A3.) Yet, Jones admitted that she was driving during much of the telephone call. (Tr. at 276-78, 295.) Moreover, balanced against Jones' testimony that she never picked up the gun are two simple facts: First, when the police searched the same location her son described to her they found no gun. (Tr. at 134-41, 147-49; State's Exs. B1-B2, C1-C11.) Second, when the police searched her house, they found a gun that visibly showed some evidence of superficial rust. (Tr. at 148-51, 205; State's Exs. S32-S34, T2.)

{¶ 27} To explain the gun that was found in the search of her home, Jones offered a theory that an abusive ex-lover had hidden the gun in her house years before in an attempt to frame her. (Tr. at 283-87.) She claimed that she had never discovered it in the years since because, even though the purse containing the gun was in the center of the top shelf in her closet, she had not looked in it since her mother died in 2010. *Id.*; State's Exs. S29-S30. However, this theory was disrupted when, on cross-examination during the trial, she was confronted with a recorded telephone call she placed from jail in which she inquired whether officers who searched her home had dumped the purses out and stated that she knew there was a BB gun "[in] there." (Tr. at 317-19.)

{¶ 28} Under the circumstances "viewing the evidence in a light most favorable to the prosecution," we conclude that a "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Monroe* at ¶ 47. In addition, weighing the evidence, considering credibility, and drawing inferences the way a juror might, we do not agree that the factfinder here " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *Martin* at 175. Consequently, we find that Jones' conviction for obstruction was sufficiently supported and was not against the manifest weight of the evidence.

{¶ 29} The crime of having a weapon while under a disability is defined in relevant part as follows:

> Unless relieved from disability * * * no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:
>
> * * *
>
> (2) The person * * * has been convicted of any felony offense of violence * * * .

R.C. 2923.13(A)(2). Jones stipulated that she had been convicted of a disqualifying offense of violence. (Tr. at 461-62.) She offers no separate arguments as to this offense beyond those offered above about why the evidence did not establish that she picked up (and knowingly acquired or carried) the gun. (Jones' Brief at 12-13.) Those urgings are just as unavailing in this context as in the context of obstruction of justice. *See supra* at ¶ 25-28.

Thus, we find that Jones' convictions were sufficiently supported and not against the manifest weight of the evidence.

{¶ 30} We overrule Jones' second assignment of error.

**IV.  CONCLUSION**

{¶ 31} The record provides no evidence on which Jones could rely to establish that her trial counsel rendered ineffective assistance when he failed to file a motion to suppress because Jones did not present any basis upon which evidence should have been suppressed in this case.  Jones' testimony does not affect the legal determination of her guilt for either the sufficiency or manifest weight of the evidence against her for obstruction of justice and having a weapon while under a disablility.  Therefore, we overrule Jones' two assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and BEATTY BLUNT, JJ., concur.

————————————